FILED
United States Court of Appeals
Tenth Circuit

February 27, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAMELA D. FYE,

        Plaintiff - Appellant,

    v.

OKLAHOMA CORPORATION
COMMISSION, a State Agency; DENISE
A. BODE, individually; BOB
ANTHONY, individually; JEFF CLOUD,
individually; TOM DAXON, individually;
R CLARK MUSSER, individually,

        Defendants - Appellees.

No. 06-6307

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D. Ct. No. CIV-03-1477-C)**

Mark Hammons, Hammons, Gowens & Associates, Oklahoma City, Oklahoma,
appearing for Appellant.

David W. Lee (Ambre C. Gooch, with him on the brief), Comingdeer, Lee &
Gooch, Oklahoma City, Oklahoma, appearing for Appellees.

Before **TACHA**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TACHA**, Circuit Judge.

Plaintiff-Appellant Pamela Fye appeals the District Court's entry of summary judgment in favor of Defendant-Appellee Oklahoma Corporation Commission ("OCC") on her claim of retaliatory discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*., and its denial of her motion for reconsideration of that issue. We have jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

The OCC hired Ms. Fye as the Director of Personnel in 1996 and shortly thereafter promoted her to Director of Administration, a position she held until her termination in March 2003. Her responsibilities included overseeing the human resources, finance, public information, and mail-room functions of the OCC. The facts relevant to this appeal occurred primarily from the beginning of February 2003 through Ms. Fye's termination on March 6, 2003.[1]

On February 3, 2003, the OCC hired Thomas Daxon as Acting General Administrator, the top administrative officer at the OCC. He was brought in on a temporary basis to reorganize and downsize the OCC due to impending state budget cuts. When Mr. Daxon first arrived at the OCC, he met with Commissioner Denise Bode to discuss issues that he needed to address during the reorganization process. Specifically, he asked Commissioner Bode whether the

---

[1]As always on summary judgment, we recite the facts in the light most favorable to Ms. Fye, the nonmoving party. *See Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1266 (10th Cir. 1998).

OCC had experienced any problems with sexual harassment, a concern that stemmed from his knowledge of such conduct in other state agencies. Commissioner Bode suggested that he consult Ms. Fye regarding sexual harassment issues because Ms. Fye, in her role as Director of Administration, acted as a contact for employee complaints and because Ms. Fye herself had previously complained that she had been sexually harassed at the OCC.

Mr. Daxon then questioned Ms. Fye concerning her earlier allegation of harassment, and she told him what took place. According to Ms. Fye, Mr. Daxon questioned her on four other occasions that month concerning the harassment, wanting to know the specific details of what had occurred. Mr. Daxon contends that he wanted to verify that the issue had been resolved and wanted to send a message that sexual harassment would not be tolerated. Nevertheless, on two occasions Ms. Fye told Mr. Daxon that she did not want to respond because his questions made her feel uncomfortable. Also in February, Ms. Fye received complaints of sexual harassment involving Mr. Daxon from two other employees. At a meeting on February 24, 2003, Ms. Fye raised her concerns about Mr. Daxon's alleged sexual harassment of her and others to Commissioner Bode.

During the same time period, Mr. Daxon held meetings nearly every day to discuss the budget crisis. Both Ms. Fye and Clark Musser, the general counsel, were often present. Throughout February, the relationship between Ms. Fye and Mr. Musser became increasingly strained. Mr. Musser was aggressive and

verbally abusive when Ms. Fye disagreed with his opinions. Ms. Fye expressed her displeasure with Mr. Musser's behavior to Mr. Daxon, but according to Ms. Fye, Mr. Daxon claimed he did not notice any inappropriate conduct. Mr. Daxon testified that he did notice that Ms. Fye held some animosity toward Mr. Musser, and he felt that she was trying to find fault in Mr. Musser's job performance.

On February 28, Ms. Fye had an altercation with Mr. Musser during a meeting in Mr. Daxon's office. Shirley Hull and Mr. Daxon were also present. Mr. Musser expressed his dismay over the uncleanliness and disrepair of the office building. Ms. Fye explained that the building manager attempted to address the problems but was prevented from doing so by upper-level management. According to Ms. Fye, the disagreement escalated when Mr. Musser continued to provoke her, at which point she prepared to leave the office to let the situation calm down. Mr. Daxon, who had not been paying attention to the discussion, said that he wanted an explanation as to what provoked the confrontation before Ms. Fye could leave. He then motioned for Ms. Hull to exit the office. Ms. Fye tried to follow Ms. Hull out of the office, but Mr. Daxon grabbed her elbow to keep her in the room. Ms. Fye raised her voice and told Mr. Daxon that the problem was "about the way this man treats me and it is unacceptable." She looked at Mr. Musser and said, "I'm sorry your arrogance will not allow you to hear what I am saying." Mr. Daxon told Ms. Fye to return to her office and said he would come see her there.

A few hours later, Mr. Daxon came to Ms. Fye's office to discuss the altercation. Ms. Fye was visibly distraught and upset. During their conversation, Mr. Daxon again asked her about her earlier allegations of sexual harassment. She informed him that she had reported Mr. Daxon's "harassment" regarding these prior allegations to Commissioner Bode. Mr. Daxon instructed Ms. Fye to take the rest of the day off and said that he would try to assist her with her problems the following week.

The following Monday, March 3, Ms. Fye called in sick to work. On March 4, she returned to deliver a letter to Mr. Daxon stating, in pertinent part:

> [A]s you have been persistent in questioning me regarding that "sexual harassment" incident between myself and [another employee] several years ago, I am not comfortable and do not understand your intent. However, as I have advised our attorneys, Denise Bode, and yourself, I feel it is inappropriate for you to ask me about this matter and I request that you do not do this again. . . .
> Because of my discomfort and our need to work quickly regarding budget, personnel matters, and legislation, I would appreciate it if when either you or Mr. Musser need to speak with me regarding [one] of these topics one of the following people be present:
>> Budget – Shirley Hull
>> Personnel – Chandra Graham or a member of the Human Resources staff
>> Legislation – Jerry Matheson or Jim Palmer
>
> These people would preserve any confidentiality as they are already involved in these areas within the scope of their duties.

Prior to receiving Ms. Fye's letter, Mr. Daxon did not plan to terminate her. He testified that he felt the demands presented in the letter, however, would

prevent the OCC from functioning efficiently during the reorganization—a time when quick and decisive action was of the utmost importance. Consequently, Mr. Daxon informed the Commissioners that he believed Ms. Fye should be terminated immediately. With no objections from the Commissioners, he delivered the following letter to Ms. Fye on March 6:

> The requirements and demands set forth in your letter are such that I have lost confidence in your ability to meet the demands that will be placed upon you. A spirit of cooperation and team work, particularly among management, is necessary for the proper functioning of this Agency. As a result, I have decided to terminate your employment with the Oklahoma Corporation Commission, effective immediately.

In October 2003, Ms. Fye filed suit in federal district court, alleging sexual harassment in violation of Title VII, retaliation in violation of Title VII and the Family Medical Leave Act (FMLA), and breach of contract and negligent hiring and retention in violation of Oklahoma law. The OCC moved for summary judgment on all claims. The District Court granted the OCC's motion for summary judgment on Ms. Fye's retaliation claims—under both Title VII and the FMLA—as well as her breach of contract and negligent hiring claims, but it denied summary judgment on Ms. Fye's sexual harassment and negligent retention claims. Ms. Fye filed two motions for reconsideration of the court's entry of summary judgment on the Title VII retaliation claim. The District Court denied both motions. The parties subsequently settled the claims surviving summary judgment. Ms. Fye now timely appeals the District Court's entry of

-6-

summary judgment in favor of the OCC on her Title VII retaliation claim, as well as the District Court's denial of her second motion for reconsideration.

## II. DISCUSSION

We review the grant of a summary judgment motion de novo. *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Stover*, 382 F.3d at 1070.

A.      Evidence Before the District Court

Before we address whether there is sufficient evidence of retaliation to withstand summary judgment, we must first decide what evidence we will consider in making that determination. *See Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1319 (10th Cir. 1998) ("In reviewing a grant of summary judgment, we do not consider materials not before the district court."). In her motion in opposition to summary judgment, Ms. Fye pointed to a laundry list of evidence in the record to support her claim of retaliation. On appeal, however, she limits her argument to four specific pieces of evidence: (1) the March 6 termination letter Mr. Daxon wrote to Ms. Fye; (2) a portion of the

transcript from Mr. Daxon's deposition, in which he stated that although he viewed Ms. Fye's March 4 letter as an act of insubordination, it was "not necessarily" a sufficient act of insubordination to justify terminating her employment; (3) the OCC's position statement to the Oklahoma Employment Security Commission ("OESC") dated May 27 ("May 27 statement"); and (4) a portion of a letter dated May 23 from the OCC to the OESC responding to Ms. Fye's request for unemployment benefits ("May 23 letter").

### 1. The May 27 Statement

Although our review of the record is de novo, "we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). We have previously explained the special importance of bringing supportive facts to the attention of the district court in an employment discrimination case. Because of the sheer volume of the record in such cases, a party cannot expect the district court to comb the record and make the party's case for it. *See id.* at 672. Although the document containing the May 27 statement was in the summary judgment record, the lone reference to it is in a string cite in the fact section of Ms. Fye's motion opposing summary judgment. Moreover, the portion of the document cited in the fact section does not even include the May 27 statement she now relies upon. In her two subsequent

motions for reconsideration she again failed to bring the statement to the District Court's attention. Not surprisingly then, the District Court did not consider it when ruling on her motions. *See id.* ("The district court has discretion to go beyond the referenced portions of [the record], but is not required to do so."). Ms. Fye had three opportunities to tie this statement to her pretext and retaliatory motive arguments and offers no explanation for why she neglected to do so. Consequently, we decline to consider the May 27 statement.

2.    The May 23 Letter and Second Motion for Reconsideration

The May 23 letter was not included in the summary judgment record. Ms. Fye first brought it to the District Court's attention in her second motion for reconsideration,[2] which was filed nearly two years after the District Court made its initial summary judgment ruling. The District Court denied Ms. Fye's motion, a ruling we review for an abuse of discretion. *See Price v. Philpot*, 420 F.3d 1158, 1167 & n.9 (10th Cir. 2005). We will not disturb the District Court's decision unless we have a "definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1331

---

[2]The District Court's partial summary judgment ruling was not a final judgment. Thus, Ms. Fye's motion for reconsideration is considered "an interlocutory motion invoking the district court's general discretionary authority to review and revise interlocutory rulings prior to entry of final judgment." *Wagoner v. Wagoner*, 938 F.2d 1120, 1122 n.1 (10th Cir. 1991). In such a case, the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b).

(10th Cir. 1996) (quotation omitted).[3]

Ms. Fye concedes that the May 23 letter was in her possession from the commencement of the lawsuit and is not newly discovered evidence. Nevertheless, she neglected to include it in the summary judgment record. On November 11, 2004, the District Court granted the OCC's motion for summary judgment on the retaliation claim. On May 24, 2006, Ms. Fye filed her first motion for reconsideration, in which she argued that the March 6 termination letter was either direct or circumstantial evidence of retaliatory intent sufficient to withstand summary judgment. The District Court reviewed the evidence of retaliation and denied the motion. On August 30, 2006, Ms. Fye filed a second motion for reconsideration, arguing that the May 23 letter, when viewed together with the March 6 letter, raised a genuine issue of material fact as to retaliatory intent. This time, the District Court declined the invitation to review its prior ruling, stating that, under the circumstances, "considerations of fairness and judicial economy clearly outweigh Plaintiff's interest in getting a second (or third) bite at the summary judgment apple."

We cannot say that the District Court abused its discretion in denying Ms.

---

[3]Ms. Fye urges us to apply the factors set out in *Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1210 (10th Cir. 2002). These factors, however, are applied when the district court denies a motion to amend a pretrial order that results in the exclusion of an issue at trial. Ms. Fye does not cite a single instance where we have applied these factors in the context of a motion for reconsideration, and we decline to do so here.

Fye's second motion for reconsideration. The District Court could properly consider the fact that the motion was filed nearly two years after the court granted summary judgment, that Ms. Fye conceded she knew of the letter the entire time, and that the court had already reopened the inquiry several months earlier on Ms. Fye's first motion for reconsideration. Given these facts, the court's decision was not "a clear error of judgment," nor did it "exceed[] the bounds of permissible choice in the circumstances." *Id.* at 1331 (quotation omitted). Furthermore, because the District Court did not consider the May 23 letter, we also decline to consider the letter on appeal. We therefore proceed to review Ms. Fye's retaliation claim on the basis of the March 6 termination letter, as well as Mr. Daxon's deposition testimony.

B.    Title VII Retaliation Claim

Under 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways. Under what is often characterized as a "mixed-motive" theory, the plaintiff may directly show that retaliatory animus played a "motivating part" in the employment decision. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion), *superseded in part by* 42 U.S.C. §§ 2000e-2(m), 2000e-

5(g)(2)(B); *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999).

Once the plaintiff proves that retaliatory animus was a motivating factor, the

burden of persuasion shifts to the defendant to prove that it would have taken the

same action absent the retaliatory motive.[4]  *See Price Waterhouse*, 490 U.S. at

252 (plurality opinion); *id.* at 261 (O'Connor, J., concurring in the judgment)

(agreeing with plurality that the burden of persuasion should shift to the employer

once the plaintiff proves that an unlawful motive was a motivating factor); *see*

*also Medlock*, 164 F.3d at 550 ("Once plaintiff presented evidence that retaliation

played a motivating part in [the employer's] decision to discharge him, it became

[the employer's] burden to prove by a preponderance that it *would* have made the

same decision notwithstanding its retaliatory motive." (quotation omitted)).[5]

---

[4]Some courts refer to this as an affirmative defense available to the employer. Whether it is characterized as a shifting of the burden of persuasion or an affirmative defense, however, is irrelevant.  *See Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 203 (D.C. Cir. 1997) ("The question of characterization is 'semantic,' and need not be definitively resolved."), *vacated in part on other grounds*, 1998 WL 1988451 (D.C. Cir. 1998).

[5]As we explained in *Medlock*, the statutory amendment codifying the "motivating factor standard," 42 U.S.C. § 2000e-2(m), superseded the Supreme Court's holding in *Price Waterhouse* that "an employer can avoid a finding of liability by proving it would have taken the same action even absent the unlawful motive."  *Medlock*, 164 F.3d at 552.  We noted, however, that *Price Waterhouse* continues to govern the "respective burdens of plaintiff and defendant in a mixed motive case," and the statutory amendments only alter the remedies available to parties when they meet their burdens.  *Id.* at 551 n.3.  Moreover, we have yet to decide whether these amendments actually apply to retaliation cases, and we decline to do so today because we conclude that Ms. Fye has not presented evidence sufficient to survive summary judgment.  *See id.* at 552 n.4 (noting

(continued...)

-12-

If, however, the plaintiff is unable to directly establish that retaliation played a motivating part in the employment decision at issue, she may rely on the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation. *See Medlock*, 164 F.3d at 549–50. We emphasize that a plaintiff need not characterize her case as a mixed-motive or pretext case from the outset. Although the distinction between a mixed-motive and pretext case is crucial on appellate review, the Supreme Court has explained that such a distinction at the beginning of a case is unnecessary. *See Price Waterhouse*, 490 U.S. at 247 n.12 (plurality opinion) ("Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning in the District Court; indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both."). At some point, however, the plaintiff must persuade the factfinder either that the evidence shows retaliation was a "motivating factor" (in which case the evidence is analyzed within the mixed-motive framework) or that it shows the employer's reason is unworthy of belief (in which case it is analyzed within the pretext framework). On appeal, Ms. Fye does not rely on one theory, but instead argues that the evidence directly reflects the OCC's unlawful motive *and* demonstrates that the OCC's reason is a pretext for retaliation. We therefore

---

[5](...continued)
employer's argument that the plain language of 42 U.S.C. § 2000e-2(m) does not include retaliation cases but declining to decide the issue).

-13-

analyze the evidence using both frameworks.

1.      Mixed-Motive Theory of Retaliation

A mixed-motive case is not established, and the *Price Waterhouse* framework does not apply, until the plaintiff presents evidence that directly shows that retaliation played a motivating part in the employment decision at issue. We have referred to this method of establishing retaliation as "the direct method," *see Medlock*, 164 F.3d at 550, but we emphasize that although some of our cases seem to suggest otherwise, we do not require "direct" evidence "in its sense as antonym of 'circumstantial.'" *See Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992); *see also Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) ("Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume."). Thus, a plaintiff can establish retaliation "directly" under *Price Waterhouse*, through the use of direct or circumstantial evidence.

In a mixed-motive case, the plaintiff must demonstrate "that the alleged retaliatory motive 'actually relate[s] to the question of discrimination in the *particular* employment decision'" and may do so through the production of either direct or circumstantial evidence. *Medlock*, 164 F.3d at 550 (quoting *Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 203 (D.C. Cir. 1997)) (emphasis added) (alteration in original). Although circumstantial evidence is sufficient to establish that the employer was motivated by retaliatory animus, that

-14-

circumstantial evidence must be tied "directly" to the retaliatory motive. *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) ("A plaintiff will be entitled to the burden-shifting analysis set out in *Price Waterhouse* upon presenting evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude." (alteration in original) (quotations omitted)).

Ms. Fye argues that the March 6 letter "by itself and without reference to other, supportive evidence demonstrates direct evidence of discrimination." We first note that the March 6 letter is clearly not direct evidence of retaliation, as it is not retaliatory on its face and would require us to infer retaliatory motive on the part of the OCC. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) ("Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." (quotation omitted)). Ms. Fye may, however, use circumstantial evidence to establish directly that retaliatory animus played a motivating part in the OCC's decision to terminate her.[6] Such circumstantial evidence must relate "to a [retaliatory] reason

---

[6]Ms. Fye argues that the Supreme Court's decision in *Desert Palace*, *Inc. v. Costa*, 539 U.S. 90 (2003), modified our existing precedent. *Desert Palace*, however, decided that a plaintiff may use both direct and circumstantial evidence to establish a mixed-motive case and did not affect our precedent. *Id.* at 101. The Court specifically noted that Title VII is silent "with respect to the type of evidence required in mixed-motive cases" and held that a plaintiff may prove her case using either direct or circumstantial evidence. *Id.* at 99. To the extent that any of our cases hold that direct evidence is required to establish a mixed-motive

(continued...)

for the employer's action."  *Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004) (quotation omitted).  The March 6 letter does not, however, resemble the evidence of conduct or statements by a decisionmaker that we have previously held sufficient to satisfy a plaintiff's burden of directly showing retaliatory motive.  *See, e.g.*, *Thomas*, 111 F.3d at 1512 (holding that plaintiff was entitled to a mixed-motive instruction when people involved in the promotion decision expressly stated that plaintiff would not be considered due to his discrimination complaint); *Kenworthy v. Conoco*, 979 F.2d 1462, 1471 n.5 (10th Cir. 1992) (holding evidence was sufficient to warrant a mixed-motive instruction when there was testimony that a supervisor held plaintiff's EEOC filing against her, falsified and altered her performance evaluations, and misrepresented incidents involving plaintiff; and a manager testified that he relied on a misrepresented incident in his decision not to promote plaintiff).

Ms. Fye relies primarily on *Medlock*, contending that the March 6 letter presents "more direct" evidence of retaliation than was present in that case.  In *Medlock*, the plaintiff filed suit alleging discriminatory pay on the basis of race.  Shortly after his deposition for that case was taken, the plaintiff was suspended and then fired.  164 F.3d at 549.  The employer suspended him "[a]s a result of

_____

[6](...continued)
case, they are no longer good law.  *See, e.g.*, *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1208 n.4 (10th Cir. 1999) ("[A] mixed motives analysis only applies once a plaintiff has established direct evidence of discrimination.").

-16-

issues raised in [his] deposition." *Id.* at 550 (quotation omitted). The employer fired him, in part, because of his continuous "dissatisfaction with [his] compensation." *Id.* (quotation omitted). The plaintiff then amended his complaint to allege retaliatory discharge. We held that there was sufficient evidence that directly reflected the retaliatory motive. Specifically, we noted that the suspension letter admitted on its face that the employer considered the subject matter of the plaintiff's deposition, which included testimony about his race discrimination claim. *Id.* We also noted that the termination letter explicitly referred to the plaintiff's dissatisfaction with his compensation, which formed the primary basis for the discrimination claim. *Id.* This evidence "may be viewed as *directly* reflecting the alleged [retaliatory] attitude." *Thomas*, 111 F.3d at 1512 (quotation omitted) (alteration in original) (emphasis added).

By contrast, the March 6 termination letter does not suggest that the OCC considered anything other than the demands made by Ms. Fye when it terminated her. Rather than "directly reflecting" a retaliatory motive, it reflects the OCC's concern for an expeditious and cooperative restructuring of the agency. We agree with the District Court that the letter "does not contain verbiage from which a reasonable inference of . . . retaliatory animus[] may be drawn."

2.     Pretext Theory of Retaliation

Ms. Fye can also prove her retaliation claim indirectly, invoking the *McDonnell Douglas* framework. Under this familiar framework, Ms. Fye must

first establish a prima facie case of retaliation by showing "(1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004). If Ms. Fye makes the prima facie showing, the OCC must proffer a legitimate, nondiscriminatory reason for her termination. *Id.* Ms. Fye then has the burden of demonstrating that the OCC's asserted reasons for her termination are pretextual. *Id.*

Ms. Fye has presented evidence sufficient to create a prima facie case of retaliation. First, Ms. Fye contends that she complained of Mr. Daxon's alleged sexual harassment of her and others at a meeting on February 24, 2003 with Commissioner Bode. At the summary judgment stage, we must draw all inferences in her favor, and we have noted that "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Thus, her complaint unquestionably constitutes protected activity. Second, Ms. Fye has presented evidence sufficient to establish a causal connection between this protected activity and her termination, which is clearly an adverse employment action. For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action. *See Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228

-18-

(10th Cir. 2006) (stating that a plaintiff can establish a causal connection by presenting evidence that "protected conduct [was] closely followed by adverse action"). On February 28, 2003, Ms. Fye informed Mr. Daxon that she had discussed his actions with Commissioner Bode. The close temporal proximity between Ms. Fye's meeting with Commissioner Bode and her termination—less than two weeks—is alone sufficient to establish a causal connection between her protected activity and termination. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that twenty-four days is sufficient to infer existence of causal connection).

Because Ms. Fye has satisfied her burden to establish a prima facie case of retaliation, the OCC must proffer a legitimate, nondiscriminatory reason for her termination. Establishing a legitimate, nondiscriminatory reason is a burden of production and "can involve no credibility assessment." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quotation omitted). The OCC contends that it terminated Ms. Fye based on the demands set forth in her March 4 letter, which ultimately caused Mr. Daxon to lose confidence in her ability to work closely with Mr. Musser and himself at a time when it was critical that there be a "spirit of cooperation and team work, particularly among management." This is a legitimate, nondiscriminatory reason for Ms. Fye's termination, and Ms. Fye has the burden of demonstrating that this proffered explanation is a pretext for retaliation.

To show pretext, Ms. Fye "must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Argo*, 452 F.3d at 1203 (quotations omitted). The OCC contends that it terminated her employment because the demands included in her March 4 letter would prevent it from functioning in a timely and efficient manner. On appeal, Ms. Fye does not assert the pretext arguments she made before the District Court,[7] and she has failed to present any evidence that casts doubt on the OCC's proffered explanation. The fact that Mr. Daxon testified in his deposition that he did not view Ms. Fye's March 4 letter as a sufficient act of insubordination to warrant firing her does not establish pretext. The OCC never suggested that it fired Ms. Fye because it viewed her as insubordinate.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the District Court's grant of

---

[7]In her opening brief, Ms. Fye primarily argues that there is "direct evidence" of retaliation in this case and cited mixed-motive cases in support. Although at times Ms. Fye's arguments sound in pretext—e.g., "the supposedly legitimate reason . . . was merely a reflection of OCC's hostility regarding what it considered to be a fabricated claim of sexual harassment"—she does not develop the argument that the OCC's proffered reason is pretextual. In fact, the words "pretext" and "pretextual" appear only three times in her brief. As we explain above, however, even if we read her brief to allege a pretext theory of retaliation, her argument must fail.

summary judgment in the OCC's favor on Ms. Fye's claim of unlawful retaliation under Title VII and its denial of Ms. Fye's August 30, 2006 motion for reconsideration.