FILED
United States Court of Appeals
Tenth Circuit

March 19, 2009

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

MARCIAL A. AVILA,

Plaintiff-Appellant,

v.

JOSTENS, INC.,

Defendant-Appellee.

No. 08-3167
(D.C. No. 5:06-CV-04123-SAC)
(D. Kan.)

ORDER AND JUDGMENT[*]

Before **McCONNELL**, **McKAY**, and **GORSUCH**, Circuit Judges.

Marcial A. Avila appeals from the district court's grant of summary

judgment in favor of his former employer, Jostens, Inc., on his claims of national

origin discrimination and retaliation in violation of Title VII of the Civil Rights

Act of 1964. We conclude that there is evidence in the record from which a

---

[*]      After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

reasonable jury could conclude that Jostens' proffered reasons for discharging Mr. Avila were pretextual, and, therefore, we reverse.

Factual Background

The following facts are set forth in the light most favorable to Mr. Avila, as the nonmoving party. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). Mr. Avila worked for Jostens, a yearbook publisher, from 1995 until his termination in September 2003. He worked in the bindery department, where his job duties included counting yearbooks, packing them into boxes, and printing labels and affixing the labels on boxes for shipping. Mr. Avila is a lawful resident of the United States, but was born in Mexico and immigrated to the United States in 1984. He is primarily fluent in Spanish, and has only a limited understanding of English. He alleges that he was terminated because of his national origin and in retaliation for initiating a union grievance that alleged discrimination.

Mr. Avila received his first warning about his work quality in August 2000, for miscounting books and, thus, sending a short shipment. Aplt. App. at 136. He received two warnings in 2001, one in February for slow productivity and one in August for miscounting books. *Id*. at 138, 140. Mr. Avila's overall performance was rated as unacceptable in his August 2001 annual performance review. In 2002, however, Mr. Avila received no warnings and on his 2002

annual review, his performance was rated as "on target" in all areas by his then-supervisor, Jim Keeffe. *Id*. at 151.

In 2003, Mr. Avila received a warning from Mr. Keeffe in February that he had boxed 900 calendars without drilling a top hole in them. In May 2003, Mr. Avila received a warning from Mr. Keeffe that he had failed to do quality checks on a shipment, had kicked boxes and glared at a co-employee. Mr. Avila disagreed with the allegations in this warning. With an interpreter, he met with Mr. Keeffe; Ms. Alcantar, an employee relations representative of Jostens; and a union representative. He claimed that he had done the quality checks and had not kicked any boxes or glared at the employee. During this meeting, Mr. Keeffe told Mr. Avila's interpreter to be quiet and told Mr. Avila–at least once, according to some witnesses, twice according to Mr. Avila–that "[t]his is America. . . ; [y]ou need to speak American," *id*. at 292, 299, or to "speak English," *id*. at 254. Ms. Alcantar told Mr. Keeffe this comment was very inappropriate and apologized to Mr. Avila. *Id*. at 254. Mr. Avila felt that Mr. Keeffe was making fun of him during the meeting and testified that his co-workers who overheard Mr. Keeffe's statement later told him, "[i]f you don't speak English, go back to Mexico." *Id*. at 272-73.

After the meeting, Mr. Avila's union representative, Mike Vannordstrand, sent Jostens a letter stating that Mr. Avila's co-worker, James Scott, had not seen Mr. Avila kick any boxes, glare at the other co-worker or fail to do the quality

check. *Id*. at 299. The union representative stated that Mr. Keeffe was disrespectful to Mr. Avila and that Mr. Avila believed he was being discriminated against because he spoke his native language, Spanish. *Id*. The letter stated the union's belief that the May 2003 discipline violated the union contract and requested that it be removed from Mr. Avila's record. *Id*. Ms. Alcantar does not recall conducting any investigation into this letter or its claim of discrimination. *Id*. at 252.

Mr. Scott later testified that, contrary to the allegations in the May 2003, warning, another employee had failed to glue the books, so he and Mr. Avila unpacked them all, redid all the books, and got them back in the box to be relabeled, and that was Mr. Avila's only involvement with the books on the May 2003 day in question. *Id*. at 219. Mr. Scott stated he told the union representative that Mr. Avila had not kicked any boxes. *Id*. at 220.

In August 2003, Mr. Keeffe rated Mr. Avila as having "exceptional" performance in quality of work and attendance, and "on target" in productivity, safety and Jostens' values, for an overall "on target" performance. *Id*. at 298. But that same month, on August 25th, Mr. Keeffe gave Mr. Avila a "Pre-term[ination]" warning for failing to follow special instructions regarding the boxing and shipping of an order and suspended him for three days. *Id*. at 159. This warning stated that any further quality issues with his work in the next year

-4-

would result in his termination. Mr. Avila refused to sign this warning; he claimed it was a very minor error that took only an hour to fix.

On September 2, 2003, the union filed a grievance on behalf of Mr. Avila regarding the August 25th warning and suspension. The union stated its position that the warning was unjust because the error was caught before the shipment left Jostens, other workers made worse mistakes without any disciplinary action taken against them at all, and Mr. Avila should not have received anything more than a coaching. *Id.* at 302. The union stated its position that Mr. Keeffe had repeatedly discriminated against Mr. Avila based on his national origin. *Id*. It requested the warning be taken off Mr. Avila's record and that he be paid for the three days of suspension. *Id*. On or about September 4th, Mr. Keeffe reassigned Mr. Avila to a different line with a different operator than the operator with whom he had worked the previous four years. *Id*. at 234-35.

On September 9, 2003, six days after the union filed its grievance, a supervisor other than Mr. Keeffe issued another "Pre-term[ination]" warning to Mr. Avila, stating that an unnamed fellow employee expressed concern about Mr. Avila's willingness to work, claiming that Mr. Avila expected this employee to do all the work while he stood watching. *Id*. at 161. The warning also stated Mr. Avila had changed the stack count on an order, when that was not his job to do. *Id*. The warning stated that any further issues, regardless of severity, would result in Mr. Avila's termination. The union filed a grievance on Mr. Avila's

-5-

behalf as to this warning, stating that Mr. Avila had been doing his job for nine years, while one of the two employees who complained about Mr. Avila had problems with all of the other boxers and the other had only been working at Jostens for six months. *Id*. at 300. The union stated its belief that this warning was unjust and was based solely on Mr. Keeffe's dislike of Mr. Avila, and that Mr. Keeffe "went out of his way to find reason to write up [Mr. Avila]" and to create a hostile working environment for him and to discriminate against him because of his national origin. *Id.*

On September 12, 2003, Mr. Keeffe fired Mr. Avila, stating in the termination letter that on September 11, Mr. Avila had failed to notice during his quality check that a full run of 904 yearbooks was "bad." *Id*. at 163. The letter recited the previous warnings issued in 2003, and stated that Mr. Avila's quality had not improved, despite these warnings.

The union again filed a grievance on Mr. Avila's behalf. It stated that the firing was unjust and without cause. *Id*. at 301. It stated that Mr. Keeffe had been threatening and supervising Mr. Avila more than other employees, and was quick to point out Mr. Avila's mistakes while ignoring mistakes by other workers. *Id*. As to the September 11th incident, the union grievance stated that "the whole job . . . had 'scratches' on it right from the beginning, which leads the union to believe that it was set-up that way, which is not [Mr. Avila's] job." *Id.* The union stated its belief that Mr. Avila was again being discriminated against

because of his national origin and asked Jostens to reinstate him. *Id*. No other worker at Jostens, including the other boxer with Mr. Avila, was disciplined in any way for the scratches. Jostens did not process any of the September 2003, union grievances filed on Mr. Avila's behalf because Mr. Avila filed a charge of discrimination with the Kansas Human Rights Commission, which found probable cause to believe Mr. Avila was discriminated against based on his national origin.

Mr. Frickey operated the line on which Mr. Avila worked for four years. Mr. Frickey testified that Mr. Avila did a "great job," he had no recollection of Mr. Avila ever making a mistake, and their line had very high productivity. *Id*. at 232-33. He testified that one week before Mr. Keeffe fired Mr. Avila, Mr. Keeffe pulled Mr. Avila off of Mr. Frickey's line and assigned him to another line with a different operator, and he was unable to get a reason for the re-assignment. *Id.* at 234-35.

As to the September 11, 2003, incident that led to Mr. Avila's termination, Mr. Frickey and the union president, Mr. Vannordstrand, both testified that if the entire run of 904 books were scratched, it would have been usual practice or policy for the operator of the line or the whole group to be blamed for the error, not the boxer. *Id*. at 236, 297. Mr. Scott testified that he was working the same machine as Mr. Avila on the day of the 904 scratched-books incident and that he was not disciplined in any way in connection with the scratched books.

*Id.* at 218. Mr. Frickey testified that it was "routine procedure" for Mr. Keeffe to ship books with scratches. *Id.* at 240.

Mr. Frickey also testified that on two occasions, he heard Mr. Keeffe state that if Mr. Avila could not speak English he should get out of the country or go back to Mexico, *id.* at 237, once right around the time that Mr. Keeffe fired Mr. Avila, *id.* at 238. He testified that Mr. Keeffe treated many employees badly, but that "it seemed to make a big difference with Jim" if the employee was black or a woman, *id.* at 242, and that he overheard Mr. Keeffe refer to a black employee as "once a ["n" word] always a ["n" word]," immediately after terminating that employee. *Id.* at 243-45.

Mr. Vannordstrand, president of the local union representing the Jostens employees, concluded, in his capacity as union president, that Mr. Keeffe discriminated against Mr. Avila because of his national origin, *id.* at 293, because (1) Mr. Avila never had any quality issues before Mr. Keeffe came, *id.* at 294; (2) Mr. Keeffe was constantly watching Mr. Avila and had him supervised more closely than other workers, *id.* at 294-95; and (3) the union investigated the allegations in the warnings issued to Mr. Avila and found no factual basis for any of the disciplinary actions against him, *id.* at 295.

## Standard of Review

"We review the district court's grant of summary judgment de novo." *Young*, 468 F.3d at 1249. Summary judgment is appropriate "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In conducting our analysis, we view all of the facts in the light most favorable to the non-movant and draw all reasonable inferences from the record in favor of the non-moving party." *Young*, 468 F.3d at 1249.

We note that the district court adopted Jostens' proposed findings of fact almost verbatim, deleting only the record citations provided by Jostens. The Supreme Court has criticized such verbatim adoption of one parties' proposed findings of fact, *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985), and this court has noted that it provides "little aid on appellate review." *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 830 (10th Cir. 2005). Nonetheless, it does not alter our standard of review. *Id.*

National Origin Discrimination

A.

Mr. Avila did not present direct evidence of racial discrimination, so we examine his claim under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Young*, 468 F.3d at 1249. Applying that framework, Jostens does not dispute the district court's ruling that Mr. Avila carried the initial burden of establishing a prima facie case of national origin discrimination. *See id.* "Once the plaintiff establishes a prima

facie case, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the adverse employment action. If the defendant makes this showing, the burden then shifts back to the plaintiff to show that the defendant's proffered justification is pretextual." *Id*. (citation omitted). Mr. Avila does not contend that Jostens failed to meet its burden to articulate a legitimate, non-discriminatory reason for his termination. Thus, the issue before this court is whether plaintiff has shown a genuine issue of material fact as to whether Jostens' proffered reasons for discharging Mr. Avila were a pretext for discrimination. *See id*.

A plaintiff need not demonstrate that discriminatory reasons motivated the employer's actions to avoid summary judgment. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1321-22 (10th Cir. 1997). The plaintiff need only make out his prima facie case and present evidence sufficient for a reasonable jury to find that the employer's proffered nondiscriminatory reason was unworthy of belief. *Id*. at 1321; *Randle v. City of Aurora*, 69 F.3d 441, 451-52 (10th Cir. 1995). Generally, a plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan*, 108 F.3d at 1323 (quotations omitted).

-10-

"In assessing this question, we approach it *de novo*, viewing the facts (and all reasonable inferences the facts entail) in the light most favorable to plaintiffs as the summary judgment respondents." *Orr v. City of Albuquerque*, 531 F.3d 1210, 1215 (10th Cir. 2008). "We are also cognizant that plaintiffs are not limited in their proof on this score; pretext can be shown in any number of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities." *Id.* (quotation omitted). "Neither, of course, do we look at each piece of evidence in isolation; rather, in assessing whether plaintiffs have shown pretext, we are obliged to consider their evidence in its totality." *Id.*

B.

Mr. Avila contends that there are genuine issues of material fact as to whether the proffered reason for his termination was pretextual–that is, unworthy of belief–, which preclude summary judgment, and that the district court erroneously resolved factual disputes in favor of Jostens. We agree, and conclude based on our *de novo* review of the evidence that the district court failed to view the evidence of pretext in its totality and failed to view the evidence in the light most favorable to Mr. Avila.

Mr. Avila argued before the district court, as evidence of pretext, that non-Hispanic employees were treated more favorably than he was when they violated the same type of work rules. The district court rejected this argument

-11-

because Mr. Avila failed to present evidence that any non-Hispanic employees had the same disciplinary record as he did. This is a circular rejection of Mr. Avila's argument, which is that he had a disciplinary record precisely *because* Mr. Keeffe–who made the decision to terminate Mr. Avila–issued warnings to him for minor errors because of his national origin, and did not issue warnings to other non-Hispanic employees for the same or similar errors. Mr. Avila presented evidence in support of this claim: (1) the union's September 2, 2003, grievance of the August 25 warning stating that other workers made worse mistakes without any disciplinary action and that Mr. Avila should only have received a coaching; (2) the union grievance and the testimony of both the union president and Mr. Frickey that if an entire run of 904 books had an error, as alleged in Mr. Keeffe's September 11, 2003, termination letter, it was Jostens' usual practice to blame the operator of that line, or the entire group involved, not only one of the boxers who failed to notice the scratches, yet no other employee received any discipline related to the 904 scratched books; (3) Mr. Scott's testimony that he was working on the same machine as Mr. Avila on the day of the 904 scratched-books incident, but was not disciplined in any way in connection with the scratched books; (4) Mr. Frickey's testimony that it was routine procedure for Mr. Keeffe to authorize the shipment of books with scratches, yet he issued a disciplinary warning to Mr. Avila for failure to notice scratched books; (5) Mr. Frickey's testimony that it made a big difference to

Mr. Keeffe in terms of discipline whether an employee was black or a woman; (6) the September 19, 2003, grievance from the union stating that Mr. Keeffe went out of his way to find reasons to write up Mr. Avila and discriminated against him because of his national origin; (7) the union's president's testimony that the union's investigation did not find any factual support for any of the warnings issued to Mr. Avila; Mr. Keeffe constantly watched and over-supervised Mr. Avila; and Mr. Avila never had any quality issues before Mr. Keeffe came to Jostens; and (8) Mr. Scott's testimony as to the May 2003 incident that it was another employee who failed to glue the books, and that Mr. Avila only helped fix the error and did not kick any boxes, yet Mr. Keeffe issued a warning only to Mr. Avila. Jostens never investigated the allegations in the union's May 2003 letter or the union's claim that Mr. Keeffe was acting out of discriminatory animus.

In addition to the foregoing evidence of disparate treatment, Mr. Avila also presented circumstantial evidence of Mr. Keeffe's discriminatory animus, namely, Mr. Keeffe's May 2003 statement that Mr. Avila should learn to speak American, and Mr. Frickey's testimony that he twice heard Mr. Keeffe state that if Mr. Avila could not speak English he should get out of the country or go back to Mexico, once right around the time that Mr. Keeffe fired Mr. Avila. We find no evidence in the record of any appropriate, work-related reasons for Mr. Keeffe's remarks; there is no evidence that Jostens required its employees, or its boxers, to speak

English, or that Mr. Avila's language affected his job performance. Mr. Keeffe made the "speak American" remark in a meeting called to discuss the disciplinary warning he had issued to Mr. Avila, and he told a group of workers that Mr. Avila should get out of the country if he couldn't speak English right about the time he fired Mr. Avila.[1] Thus, the record contradicts the district court's finding that Mr. Keeffe made only one isolated remark about Mr. Avila's language, which was months before, and unrelated to, the termination decision. We conclude these remarks are circumstantial evidence of discriminatory animus, and, given that two of the comments were made contemporaneous with Mr. Keeffe's warning and termination decisions, a reasonable jury could conclude these remarks were related to those warning and termination decisions. *Cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (per curiam) (holding that use of potentially derogatory term may be evidence of racial animus which could potentially show pretext, depending on various factors including context, inflection, tone of voice, local custom, and historical usage); *Hong v. Children's Mem'l Hosp.*, 993 F.2d 1257, 1265-66 (7th Cir. 1993) (indicating that supervisor's statement that employee should "learn to speak English," could be circumstantial proof of supervisor's discriminatory animus, or evidence that the employer's proffered reason was pretext, if plaintiff shows that the remark is related to the discharge decision); *see*

---

[1] There is also the evidence that Mr. Keeffe made a highly derogatory racial remark about an African-American employee at the very time that he fired that employee.

-14-

*also Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209-10 (10th Cir. 1999) (recognizing that derogatory "comments may serve as circumstantial evidence of discrimination, [but] the plaintiff must still show some nexus between the statements and the defendant's decision to terminate the employee") (citation omitted), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98-102 (2003).

Mr. Avila also contends he presented evidence of pretext because he received an annual job evaluation describing his work quality as "exceptional" and his overall performance as "on target" only weeks before Mr. Keeffe fired him. Aplt. App. at 157. The district court rejected this as evidence of any inconsistency, stating that Jostens presented evidence that Mr. Avila committed significant errors leading to three warnings after the date of this review, and that Mr. Avila had not presented evidence that Mr. Keeffe and the supervisor who issued those warnings did not honestly believe the reasons given for the discipline. To the contrary, Mr. Avila did present such evidence.

Mr. Avila presented evidence that after Mr. Keeffe issued the August 25 warning, Mr. Avila denied the charges and refused to sign the warning, and that the union immediately filed a grievance challenging that warning as unduly harsh and discriminatory. He presented evidence that the disciplinary actions taken against him were inconsistent with Jostens' usual procedures, namely evidence that: (1) as to the September 11, 2003, incident, if an entire run of books was

scratched, the usual practice was to discipline the line's operator, or all of the involved employees, not just the boxer; yet no one else was disciplined for the scratched books, including Mr. Scott, who was doing the same job as Mr. Avila, and it was Mr. Keeffe's routine practice to authorize the shipment of books with scratches; and (2) as to the August 25, 2003, incident, the appropriate discipline for Mr. Avila's failure to follow special instructions was coaching, not suspension.  Mr. Avila presented evidence of other weaknesses, such as (1) the allegation in the September 9, 2003, warning - that an unnamed employee said Mr. Avila was not working hard enough - is vague and entirely subjective; (2) Jostens never questioned Mr. Scott or otherwise investigated the union's May 2003 letter challenging the veracity of Mr. Keeffe's May 2003 charges against Mr. Avila and alleging discrimination by Mr. Keeffe; and (3) two of the three post-annual review warnings came mere days after the union filed a grievance on Mr. Avila's behalf alleging discrimination, which as discussed below, leads to an inference of a causal connection between Mr. Avila's protected activity and the issuance of these post-review warnings.

In sum, Mr. Avila presented evidence from which a reasonable jury could conclude that Mr. Keeffe supervised and disciplined Mr. Avila more frequently and more severely than he did non-Hispanic employees; that Mr. Keeffe made derogatory remarks about Mr. Avila's national origin contemporaneous with his disciplinary and termination decisions; that the termination for poor work quality

in September 2003 was inconsistent with the August 2003 annual performance review rating his work quality as exceptional; and that some of the warnings issued to Mr. Avila were inconsistent with Jostens' usual policies and practices. We conclude this evidence, considered in its totality and viewed in the light most favorable to Mr. Avila, would be sufficient for a reasonable jury to find that Mr. Keeffe's and Jostens' proffered nondiscriminatory reason for terminating Mr. Avila was unworthy of belief.

## Retaliation

To establish a prima facie case of retaliation by use of indirect evidence, Mr. Avila must show that: (1) he engaged in protected activity; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse action. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1227 (10th Cir. 2008). Here, it is undisputed that Mr. Avila engaged in protected opposition to discrimination when the union filed a grievance on his behalf on September 2, 2003, alleging national origin discrimination. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004) (indicating that lodging union grievance asserting discrimination constitutes protected activity). It is also undisputed that Mr. Avila suffered an adverse employment action when he was terminated. *See Fye*, 516 F.3d at 1228 (stating "termination . . . is clearly an adverse employment action"). Finally, it is undisputed that Mr. Avila established a causal connection between his protected activity on September 2,

-17-

2003 and his termination nine days later. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (holding that twenty-four days between protected activity and termination is sufficient to infer existence of causal connection). Thus, Mr. Avila established a prima facie case of retaliatory discharge.

In response, Jostens proffered a legitimate, nondiscriminatory reason for his termination, namely, that Mr. Avila's work quality did not improve after the August 25th warning because on September 9, an unnamed fellow employee expressed concern about Mr. Avila's willingness to work, and on September 11, Mr. Avila failed to notice an entire run of 904 books was scratched. Mr. Avila then has the burden of demonstrating that this proffered explanation is a pretext for retaliation. *Fye*, 516 F.3d at 1228.

The district court ruled that, as with Mr. Avila's claim of discrimination, he failed to demonstrate pretext for his retaliation claim. We disagree and conclude that, as with the discrimination claim, the district court failed to view the evidence of pretext in its totality and failed to view the evidence in the light most favorable to Mr. Avila. We need not repeat all of the evidence of pretext set forth above. Focusing just on the post-grievance September 9, 2003, warning letter and the September 11, 2003, termination letter, there is evidence in the record of weaknesses, implausibilities and inconsistencies in the proffered reason. First, the September 9, 2003, warning regarding an unnamed employee's complaint that

Mr. Avila was not working hard enough is based on vague information and subjective criteria. *See Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1328 (10th Cir. 1999) (holding that evidence of pretext may include the use of subjective criteria). Second, as to the September 11, 2003, incident that led to the termination, Mr. Avila presented evidence that if an entire run of books was scratched, it was Jostens' usual practice to blame the line's operator or all of the involved employees, not the boxer; that no other worker on that line, including Mr. Scott, who was doing the same job on the same machine that day, was disciplined for the scratched books; and that it was Mr. Keeffe's routine practice to authorize the shipment of books with scratches. *See id*. (holding that evidence of pretext may include "disturbing procedural irregularities"). Finally, it is noteworthy that, immediately after the union grievance was filed, Mr. Keeffe removed Mr. Avila from Mr. Frickey's line of operation, after four years. Given that Mr. Frickey testified that Mr. Avila did great work and did not make mistakes, the fact that Jostens issued the post-grievance warning letter and termination letter immediately after this re-assignment may undercut the credibility of the proffered reason for his termination. Thus, we conclude that Mr. Avila presented sufficient evidence of weaknesses, implausibilities and inconsistencies for a reasonable jury to conclude that Jostens' proffered reasons for discharging Mr. Avila were pretextual.

Accordingly, the judgment of the district court on Mr. Avila's discrimination claim and retaliation claim is REVERSED, and the matter is REMANDED to the district court for further proceedings.

Entered for the Court


Monroe G. McKay
Circuit Judge