**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ESTATE OF TOMAS BEAUFORD;
TIFFANY MARSH, personally and as
representative of the estate of Tomas
Beauford,

    Plaintiffs - Appellants,

v.

MESA COUNTY, COLORADO;
CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE
COMPANIES, INC.; CORRECTIONAL
HEALTHCARE PHYSICIANS, P.C.;
CORRECTIONAL HEALTHCARE
MANAGEMENT, INC.; SHERIFF MATT
LEWIS, in his official capacity; DEPUTY
PETER M. DALRYMPLE; DEPUTY
RICHARD D. PERKINSON; NURSE
RENEE WORKMAN; NURSE VELDA
HAVENS; NURSE AUDRA KEENAN;
NURSE JEANNE ANNMARIE SCHANS;
MICHAEL LEFEBRE, in his official and
individual capacities; DR. KURT
HOLMES, in his official and individual
capacities,

    Defendants - Appellees.

No. 21-1010

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:16-CV-00851-DDD-GPG)**

_____

David A. Lane (Darold W. Killmer, Michael Fairhurst, and Andy McNulty with him on the briefs), Killmer, Lane & Newman, LLP, Denver Colorado, for Plaintiffs – Appellants

Jacob Z. Goldstein (Eric P. Schoonveld, Theodore C. Hosna, and Casey Kannenberg with him on the brief), Hall Prangle & Schoonveld, LLC, Chicago, Illinois, for CHC Defendants – Appellees

Andrew B. Clauss (Chris W. Brophy with him on the brief), Dinsmore & Shohl LLP, Denver, Colorado, for Mesa County Defendants – Appellees

_____

Before **McHUGH**, **MURPHY**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

After midnight on April 16, 2014, Tomas Beauford suffered a fatal epileptic seizure in his cell while in pretrial custody at the Mesa County Detention Facility ("MCDF"). The administrator of Mr. Beauford's estate sued various Mesa County and medical defendants[1] in federal district court in Colorado under 42 U.S.C. § 1983 alleging they were deliberately indifferent to Mr. Beauford's serious medical needs in violation of the Fourteenth Amendment. The district court granted summary judgment to all defendants. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment to Deputy Dalrymple, and

_____

[1] Mr. Beauford's Estate sued Mesa County, Colorado; Sheriff Matt Lewis, in his official capacity; and Deputies Richard D. Perkinson and Peter M. Dalrymple (collectively "Mesa County Defendants"). The Estate also sued the private healthcare companies that contracted with MCDF to provide medical services to inmates, including Correct Care Solutions, LLC; Correctional Healthcare Companies, Inc.; Correctional Healthcare Physicians, P.C.; and Correctional Healthcare Management, Inc. ("CHC," and collectively, "Entity Medical Defendants"), as well as the nursing staff, physician, and mental health supervisor who oversaw Mr. Beauford's care ("Individual Medical Defendants").

accordingly, we also reverse the grant of summary judgment to the Mesa County

Defendants on the Estate's entity liability claim under *Monell v. Department of*

*Social Services of New York*, 436 U.S. 658 (1978). The district court's order is

otherwise affirmed.

## I. Background

### A. Factual Background[2]

Mr. Beauford was a 24-year-old Black male who suffered from epilepsy. He

also had a severe intellectual disability and several mental health disorders, including

bipolar disorder, paranoid schizophrenia, attention hyperactivity disorder, and

oppositional defiant disorder. Mr. Beauford's IQ was 52, and he functioned at the

level of a five- or six-year-old child.

Mr. Beauford was prescribed many medications, including anti-seizure

medicine, which he had a history of refusing. Mr. Beauford also had an implanted

Vagus Nerve Stimulator ("VNS") to control his epilepsy. A VNS is a "bodily implant

that interferes with a seizure by sending a shock through the nervous system." Aplt.

App. vol. 12 at 3292. The device "has a microprocessor that automatically stimulates

---

[2] These facts derive from our de novo review of the appellate record. The Estate filed a 30-volume appendix. But it appears volumes 14-30 are complete copies of witness depositions, which were never submitted in their entirety to the district court. Thus, we limit our review of the record to the materials in volumes 1-13, which include those portions of deposition testimony presented to the district court. *See Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) ("Although our review of the record is de novo, we conduct that review from the perspective of the district court at the time it made its ruling, ordinarily limiting our review to the materials adequately brought to the attention of the district court by the parties.") (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008)).

the vagus nerve every few minutes," and it also can be activated by a magnetic bracelet. *Id.* It is undisputed that, at the time he was arrested, Mr. Beauford had a VNS bracelet, but it was not with him when he died.

### 1. Mr. Beauford's 2014 Detention at MCDF

On March 1, 2014, Mr. Beauford was arrested on charges of assault and unlawful sexual contact and booked into MCDF. He was housed alone in a single cell, located either in the booking area or in an administrative segregation area called Cedar Pod.

Mesa County contracted with a private company—defendant CHC—to provide medical services to inmates at MCDF. Defendant Dr. Kurt Holmes oversaw CHC's medical care services and defendant Michael LeFebre was the mental health supervisor at MCDF. CHC also employed defendant nurses Velda Havens, Audra Keenan, Jeanne Schans, and Renee Workman. Each of these defendants cared for Mr. Beauford in some capacity while he was detained at MCDF.[3]

During his detention, Mr. Beauford refused medications about fifty percent of the time. The defendant nurses encouraged him to take his medicine by offering his favorite snacks, such as Taco Bell burritos and Sprite. Dr. Holmes and Mr. LeFebre knew Mr. Beauford at times refused medication, including his anti-seizure medicine. But they took no action other than to advise the nurses they should continue to offer medication and to entice Mr. Beauford to take it.

---

[3] Mr. Beauford had previously been detained at MCDF for about a month in late 2013, but that detention is not the subject of this appeal.

Mr. Beauford's physical and mental condition deteriorated at MCDF. On March 20, Mr. LeFebre visited Mr. Beauford and marked his clinical status as "poor." Aplt. App. vol. 6 at 1718-19. The nursing staff logs reported Mr. Beauford had developed a sore from spending so much time lying in bed in the same position. He sometimes refused to eat. Mr. Beauford struggled to get dressed, sit up, stand, or use the restroom on his own. He was sometimes found to be wet with urine. The jail guards frequently called for the nurses to change Mr. Beauford's clothes and bring him a new adult diaper. The nurses often observed Mr. Beauford struggle—or outright refuse—to verbalize his wants and needs. During his approximately six-week detention, Mr. Beauford suffered documented seizures on March 1, 3, and 18 and April 15. *See* Aplt. App. vol. 10 at 2778.

### 2.   The Night of April 15-16[4]

By the evening of April 15, Mr. Beauford had been refusing all medications, including his anti-seizure medicine, for the past three days. That evening and through the early morning of April 16, defendant Deputies Dalrymple and Perkinson were on

---

[4] A written summary of MCDF's video surveillance footage recorded on the night of April 15 and the early morning hours of April 16 is part of the appellate record, but the video itself is not. The video summary provides precise timestamps of the events at issue in this appeal. *See* Aplt. App. vol. 8 at 2383. The video summary appears to be consistent with the other record evidence, but there is a slight difference—about a two-minute discrepancy—between some of the times documented in the video-summary timestamps and the time of events described by the deputies in their interviews and depositions. Any discrepancy in the times reported and documented is minor, so it does not impact our analysis of the merits. Unless otherwise noted, we rely on the times reported by the deputies, as the district court did, and look to the video summary to fill in any gaps.

duty in Cedar Pod, along with Nurse Workman. Officers on the night shift conducted inmate security checks every half hour as required by MCDF policy. The exact time of each security check was recorded in the jail's computer system. While one officer performed the security check, the other officer staffed the pod station. Officers also assisted the on-duty nurse with medication rounds and took inmate head counts.

Deputies Dalrymple and Perkinson each conducted security checks from 6:00 p.m. to 7:20 p.m. on April 15 and observed no issue with any inmate. Aplt. App. vol. 8 at 2282-83. During a security check at 7:50 p.m., Deputy Perkinson stepped into Mr. Beauford's cell to pick up a dinner tray. He observed Mr. Beauford grunting underneath his blanket. Deputy Perkinson thought Mr. Beauford was probably masturbating and otherwise "seemed normal," so he did not talk to him. *Id.* at 2283. "[A]ll seemed okay" with Mr. Beauford during the next security check at 8:20 p.m. *Id.*

Around 8:40 p.m., Deputy Perkinson and Nurse Workman were on medication rounds when they came to Mr. Beauford's cell and observed him "on the bed, and completely covered by a blanket." *Id.* Deputy Perkinson first thought Mr. Beauford might be masturbating again. But "due to how he was shaking" and knowing that Mr. Beauford was an epileptic, Deputy Perkinson "had a second thought that Mr. Beauford may be seizing." *Id.* Deputy Perkinson and Nurse Workman entered Mr. Beauford's cell and discovered he was having a seizure. Nurse Workman turned Mr. Beauford on his side and sat with him through the duration of the seizure, which

6

lasted five more minutes. Deputy Perkinson and Nurse Workman then left Mr.

Beauford's cell at 8:49 p.m. to finish medication rounds. *Id.* at 2383.

At 9:01 p.m., Deputy Dalrymple performed another security check. *Id.* He

looked into Mr. Beauford's cell and saw him lying on his bed shaking with his eyes

open. Deputy Dalrymple said nothing to Mr. Beauford and continued on to complete

his check of other inmates. When interviewed by an MCDF officer a few hours after

Mr. Beauford died, Deputy Dalrymple said he reported the shaking to Deputy

Perkinson, who had assured him that, according to Nurse Workman, Mr. Beauford

would be "fine." *Id.* at 2282. At his deposition, Deputy Dalrymple likewise testified

he had reported the shaking to someone but was uncertain whether he told Deputy

Perkinson or Nurse Workman. *Id.* at 2311.

Deputy Perkinson and Nurse Workman returned to Mr. Beauford's cell at 9:21

p.m. *Id.* at 2284, 2383. Mr. Beauford refused to let Nurse Workman take his vitals

and asked them to leave. Nurse Workman assured Deputy Perkinson that Mr.

Beauford would be fine and she did not instruct the deputies to conduct extra

monitoring of Mr. Beauford.

The deputies completed more security checks about every half-hour over the

next several hours, and each time, observed Mr. Beauford laying on his bed, reading

7

or sleeping. After doing a security round at 10:15 p.m., Deputy Perkinson moved off

Cedar Pod to other duties, leaving Deputy Dalrymple as the only officer on the pod.[5]

During his security check at 11:55 p.m., Deputy Dalrymple saw Mr. Beauford

laying on the floor of his cell, facedown, with his head under his desk. *Id.* at 2281,

2310. Deputy Dalrymple used his flashlight to illuminate Mr. Beauford and watched

him for a few moments. He knew Mr. Beauford often slept in unusual positions in his

cell and believed Mr. Beauford was breathing because he saw Mr. Beauford's covers

rising and falling. *Id.* at 2282. Deputy Dalrymple then finished his security check and

returned to the pod officer station.

On his next security round at around 12:15 a.m.,[6] Deputy Dalrymple observed

Mr. Beauford lying motionless in the same position on the floor of his cell. This time,

however, Deputy Dalrymple "could not tell for sure" if Mr. Beauford was breathing.

*Id.* at 2282-83. After completing his security check, Deputy Dalrymple alerted

medical personnel he had observed Mr. Beauford lying on the floor of his cell.

"About ten minutes passed between Deputy Dalrymple's observation and his call to

---

[5] Deputy Dalrymple took a lunch break around this time, so two other deputies—including one deputy trainee—oversaw Cedar Pod and did the security checks at 11:00 p.m. and 11:30 p.m. They did not note any concerns about Mr. Beauford or any other inmate; neither officer is named as a defendant in this case.

[6] The parties rely on Deputy Dalrymple's recollection that the time was "about" 12:15 a.m., but the video summary documents this event at 12:17 a.m. *Compare* Aplt. App. vol. 8 at 2282 *with* 2383.

the [MCDF] medical staff." Aplt. App. vol. 12 at 3293. Around 12:25 a.m.,[7] Deputy

Dalrymple and Nurse Workman entered Mr. Beauford's cell and found him

unresponsive.

Nurse Workman retrieved a medical kit while Deputy Dalrymple started CPR

and other staff called 911. Deputies moved Mr. Beauford into the "dayroom area

outside the cell door in order to have room for resuscitation." Aplt. App. vol. 6

at 1548. Nurse Workman used a portable defibrillator and deputies performed chest

compressions until paramedics arrived. These rescue efforts were unavailing.

Mr. Beauford was pronounced dead at approximately 2:45 a.m. on April 16, 2014.

Aplt. App. vol. 7 at 1924. An autopsy concluded Mr. Beauford suffered "[s]udden

unexpected death in epilepsy." *Id.* at 1926; *see also id.* at 1923. Toxicology tests

showed low blood concentrations of four anti-seizure medications.

## B.    Procedural History

In 2016, the Estate filed the underlying lawsuit alleging[8] (1) § 1983 claims

against all defendants for violations of Mr. Beauford's Fourteenth Amendment right

to adequate medical care; (2) a § 1983 claim against all defendants for violation of

Mr. Beauford's Fourteenth Amendment right to life without due process of law

---

[7]Again, the parties rely on Deputy Dalrymple's estimate that this happened around 12:25 a.m. but the video summary shows it occurred at 12:28 a.m. *Compare* Aplt. App. vol. 8 at 2282 *with* 2383.

[8] The operative complaint is the Estate's third amended complaint.

against all defendants;[9] (3) a claim against Mesa County for violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; (4) a wrongful death claim against the Medical Defendants premised on medical negligence; and (5) a state-law survival claim against all defendants.

The Mesa County Defendants moved for summary judgment on all claims asserted against them. The Medical Defendants moved for summary judgment on the § 1983 medical-care claims, and Nurse Havens also moved for summary judgment on the medical negligence claim asserted against her.

The district court granted the Mesa County Defendants' summary judgment motion in its entirety. The court concluded Deputies Perkinson and Dalrymple were entitled to qualified immunity on the Estate's deliberate indifference claim because (1) the Estate failed to show the deputies violated Mr. Beauford's Fourteenth Amendment rights, and (2) no clearly established law put the deputies on notice that they could not rely on Nurse Workman's medical advice or that Deputy Dalrymple "needed to *immediately* call for help after seeing Mr. Beauford on the floor of his cell." Aplt. App. vol. 12 at 3306-07 (district court's emphasis). The district court also granted summary judgment to the County on the Estate's ADA and *Monell* claims.

---

[9] The Estate advances no appellate challenge to the district court's summary judgment ruling on the claim of deprivation of life without due process of law. Accordingly, we consider it waived. *See State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 984 n.7 (10th Cir. 1994) (explaining appellant's failure to raise issue in opening brief waives the point).

The district court granted in part the Medical Defendants' motion.[10] Finding the Medical Defendants ineligible for qualified immunity, the district court then determined there was insufficient evidence to show the Individual Medical Defendants were deliberately indifferent to Mr. Beauford's serious medical needs. And because none of the Individual Medical Defendants committed a constitutional violation, the district court further found the Entity Medical Defendants could not be liable under *Monell*.

The district court certified its interlocutory order for immediate review under Federal Rule of Civil Procedure 54(b), rendering the order final and appealable. *See HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1199 n.7 (10th Cir. 2017) (noting the district court's judgment ripened into a final and appealable order when the district court subsequently certified the judgment as final under Rule 54(b)). This appeal followed.

## II.   Discussion

### A.   Standard of Review

We review the grant of summary judgment de novo, and apply the same legal standard used by the district court under Federal Rule of Civil Procedure 56(c). *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997). Summary judgment is appropriate

---

[10] The district court denied Nurse Havens's motion for summary judgment on the Estate's medical negligence claim against her. The court also granted summary judgment in favor of the Mesa County Defendants on the Estate's state-law survival claim, holding that "'survival' isn't a separate cause of action under Colorado law," and that in any event, the Estate had made no argument regarding that claim. Aplt. App. vol. 12 at 3329 n.12. The Estate does not challenge this ruling on appeal.

if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A disputed fact is "material" if it might affect the outcome of the suit under the governing law, and the dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment standard requires us to construe the facts in the light most favorable to the nonmovant and to draw all reasonable inferences in its favor.[11] *See Lance v. Morris*, 985 F.3d 787, 793 (10th Cir. 2021). We do not have to accept versions of the facts contradicted by objective evidence, such as video surveillance footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006) (citation omitted). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Id.* (citation omitted).

---

[11] The Estate seems to suggest reversal is warranted solely because the district court misapplied the summary judgment standard. This contention is articulated only in a conclusory manner in argument headings and otherwise not meaningfully advanced in the Estate's appellate briefing. Accordingly, we do not consider it. *See Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2 (10th Cir. 1994) ("[P]erfunctory [allegations of error that] fail to frame and develop an issue [are] [in]sufficient to invoke appellate review."). Even if the Estate had appropriately framed and developed this argument, we would reject it. Though we conclude the district court erred in granting summary judgment to Deputy Dalrymple based on qualified immunity, we otherwise discern no error in the district court's application of the summary judgment standard.

We review summary judgment orders deciding qualified immunity questions differently from other summary judgment decisions. *See Nelson v. McMullen*, 207 F.3d 1202, 1205-06 (10th Cir. 2000) ("This difference arises from the unique nature of qualified immunity, which is designed to protect public officials from spending inordinate time and money defending erroneous suits at trial."). The doctrine of qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must demonstrate on the facts alleged that (1) the defendant's actions violated his or her constitutional or statutory rights, and (2) the right was clearly established at the time of the alleged misconduct. *See Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1239 (10th Cir. 2018) (quoting *Nelson*, 207 F.3d at 1206).

In the final analysis, even when qualified immunity is at issue, "the defendant still bears the normal summary judgment burden of showing that no material facts remain in dispute that would defeat the qualified immunity defense." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). "When the record shows an

13

unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.'" *Id.* at 1312 (quoting *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991)).

## B.    Constitutional Right to Adequate Medical Care for Pretrial Detainees

The right to custodial medical care is well settled. *See generally Estelle v. Gamble*, 429 U.S. 97 (1976). "The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care that the Eighth Amendment requires for convicted inmates." *Lance*, 985 F.3d at 793; *see also Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (explaining the Eighth Amendment includes "an entitlement to a certain minimum standard of medical care while incarcerated"). "Although pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment, this Court applies an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." *Olsen*, 312 F.3d at 1315.

Prison officials violate the Constitution when they act with "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). "The deliberate indifference standard lies 'somewhere between the poles of negligence at one end and purpose or knowledge at the other.'" *Id.* at 752 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The contours of constitutional liability under the deliberate-indifference standard are familiar: there is both an objective and a subjective component. *See Farmer*, 511 U.S. at 834. "[T]he focus of the objective component is the seriousness of the plaintiff's alleged harm,

14

while the focus of the subjective component is the mental state of the defendant with respect to the risk of that harm." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1044 (10th Cir. 2022).

To satisfy the objective component, the plaintiff must produce evidence that the prisoner's medical need was "sufficiently serious." *Farmer*, 511 U.S. at 834 (citation omitted). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000) (internal quotation marks omitted). A delay in medical care can also be sufficiently serious if "the delay resulted in substantial harm." *Mata*, 427 F.3d at 751. "The substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Id.* (internal quotation marks omitted).

The subjective prong requires a plaintiff to establish that a prison official had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." *Id.* (internal quotation marks omitted). Deliberate indifference means "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

15

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Mata*, 427 F.3d at 752 (citation omitted). "This is so because if a risk is obvious so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id.* (brackets and internal quotation marks omitted). But "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

## C.   Analysis

The district court concluded Mr. Beauford's epilepsy was a sufficiently serious medical condition that satisfied the objective component of the deliberate-indifference inquiry. The parties do not dispute this determination on appeal. Our analysis thus focuses on the Estate's contentions of error surrounding the subjective prong of the deliberate-indifference standard. We consider first the Estate's argument that the district court erred by concluding Deputies Perkinson and Dalrymple—the individual defendants who asserted a qualified immunity defense— did not violate Mr. Beauford's Fourteenth Amendment rights on the night of his death. We then consider the Estate's arguments about the subjective prong as it applies to the challenged conduct of the Individual Medical Defendants, who are

ineligible for qualified immunity. *See Tanner v. McMurray*, 989 F.3d 860, 874 (10th Cir. 2021).[12]

**1.    Deputy Perkinson is entitled to qualified immunity, but the district court erred in granting summary judgment to Deputy Dalrymple.**

Deputies Perkinson and Dalrymple were both on duty at MCDF the night Mr. Beauford died. We affirm the district court's ruling granting summary judgment to Deputy Perkinson, but we cannot reach the same conclusion with respect to Deputy Dalrymple.

**a.    Deputy Perkinson**

The district court ruled that Deputy Perkinson was entitled to qualified immunity because the Estate's deliberate indifference claim against him was not supported by sufficient evidence. Deputy Perkinson sought the assistance of Nurse Workman, the district court explained, and reasonably relied on her medical expertise to treat and assess Mr. Beauford's condition. On appeal, the Estate argues reversal is required because Deputy Perkinson failed to summon medical attention when it was obvious Mr. Beauford needed emergency care. We are not persuaded.

---

[12] The district court, relying on *Richardson v. McKnight*, 521 U.S. 399 (1997), rejected the assertion of qualified immunity by the Individual Medical Defendants. Aplt. App. vol. 12 at 3308-10. While acknowledging our court had not yet reached the question, the district court found it compelling that "every other circuit to address the issue has determined that *McKnight* precludes the application of qualified immunity to private medical professionals hired to work in a prison." *Id.* at 3310. The parties have not challenged this ruling on appeal and for good reason. Six months after the district court entered its amended summary judgment order, we decided *Tanner v. McMurray*, 989 F.3d 860, 874 (10th Cir. 2021), and like our sister circuits, held qualified immunity is not available to private medical professionals employed full-time in a detention facility.

The Estate's contentions of error regarding Deputy Perkinson involve three specific incidents on the night of Mr. Beauford's death. First, the Estate argues Deputy Perkinson was deliberately indifferent for "fail[ing] to check on or even ask [Mr.] Beauford what was happening during the 7:50 p.m. [security] check" when he observed Mr. Beauford grunting under his blanket. Aplt. Opening Br. at 50.

To satisfy the subjective inquiry, the Supreme Court requires actual knowledge: "the official must *both* be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*." *Farmer*, 511 U.S. at 837 (emphases added). A "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842. But this exception requires that such risks present themselves as obvious to the so-called "reasonable man." *See Mata*, 427 F.3d at 752 (citing *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Viewing the evidence in the light most favorable to the Estate, it would not have been "obvious" to Deputy Perkinson at 7:50 p.m. that Mr. Beauford was having a seizure and required emergency medical care such that a reasonable jury could infer deliberate indifference. *See id.*

Hours after Mr. Beauford died, Deputy Perkinson was interviewed and said only that Mr. Beauford was "under his blanket and grunting." Aplt. App. vol. 8 at 2283. The Estate contends that, according to Deputy Perkinson's observation, Mr. Beauford was obviously experiencing a seizure. While it is possible Deputy Perkinson witnessed a seizure at 7:50 p.m., the Estate has pointed to no evidence showing *Deputy Perkinson* believed Mr. Beauford was seizing or otherwise drew the

18

inference Mr. Beauford faced a substantial risk of serious harm to his health or safety. *See Farmer*, 511 U.S. at 837; *cf. Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) ("The Supreme Court [has] cautioned that 'an inadvertent failure to provide adequate medical care' does not rise to a constitutional violation." (quoting *Estelle*, 429 U.S. at 105-06)). Thus, the Estate has not carried its burden to show that Deputy Perkinson's failure to check on Mr. Beauford during the 7:50 p.m. rounds amounted to deliberate indifference.

Deputy Perkinson recognized more troubling physical signs one hour later while on medication rounds with Nurse Workman. At that time, Mr. Beauford was in his cell and still "on the bed, and completely covered by a blanket." Aplt. App. vol. 8 at 2283. Deputy Perkinson's "first thought was Mr. Beauford was again masturbating, however *due to how he was shaking* [Deputy] Perkinson had a second thought that Mr. Beauford may be seizing." *Id.* (emphasis added). Deputy Perkinson and Nurse Workman entered Mr. Beauford's cell and discovered he was having a seizure. They stayed with Mr. Beauford until his seizure ended. And they both returned to check on him about thirty minutes later.

The Estate argues that despite observing Mr. Beauford suffer "an over-five-minute seizure, combined with an unusually long postictal [or, recovery] state," Deputy Perkinson was deliberately indifferent because he "did not transport [Mr.] Beauford for emergent medical treatment at a hospital." Aplt. Opening Br. at 50. The Estate also maintains Deputy Perkinson "unreasonably rel[ied] on [Nurse]

19

Workman's obviously deficient advice for the care of [Mr.] Beauford when it was clear [he] needed emergency medical attention." *Id.*

The district court rejected this deliberate indifference claim, reasoning that Deputy Perkinson "recognized a potential risk, asked the medical health professional what to do about it, and followed her advice. Whether [he] might have done more doesn't alter the fact that what [he] did do is not a constitutional violation." Aplt. App. vol. 12 at 3304. We agree.

Prison officials generally may rely on the advice and course of treatment prescribed by medical personnel. *See McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009) ("[A] prison official may rely on a medical professional's opinion if such reliance is reasonable."); *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) ("Except in the unusual case where it would be evident to a layperson that a prisoner is receiving inadequate or inappropriate treatment, prison officials may reasonably rely on the judgment of medical professionals.") (citation omitted). Here, the evidence, viewed in the light most favorable to the Estate, shows Nurse Workman took the lead in providing medical care to Mr. Beauford, while Deputy Perkinson helped securely hold him on the bed and "calm him down." Aplt. App. vol. 5 at 1390. They stayed with Mr. Beauford "until the seizure was over. And then when [Nurse Workman] decided it was okay to leave, [they] exited the cell." *Id.* at 1390. When Deputy Perkinson returned later with Nurse Workman to check on Mr. Beauford, they found him uncooperative. Mr. Beauford said, "something to the effect [of] 'no, leave me alone, let me go back to sleep.'" Aplt. App. vol. 8 at 2284. Deputy

20

Perkinson performed two more security checks before rotating off Cedar Pod; both times Mr. Beauford was lying on his bed with the light off in his cell and did not appear to be "in any type of medical distress." *Id.*

As the district court correctly determined, this series of events does not evince deliberate indifference by Deputy Perkinson to Mr. Beauford's serious medical needs sufficient to satisfy the subjective component of the Eighth Amendment inquiry. *Sealock*, 218 F.3d at 1209. Deputy Perkinson alerted Nurse Workman to Mr. Beauford's "shaking" out of concern that Mr. Beauford may be seizing. Aplt. App. vol. 8 at 2283. As a result, Mr. Beauford actually received medical care during a critical time. That his condition worsened hours later does not mean Deputy Perkinson acted with deliberate indifference at 8:40 p.m.

Finally, the Estate contends Deputy Perkinson acted with deliberate indifference by failing to relay to medical personnel that, as Deputy Dalrymple reported, Mr. Beauford was shaking at 9:00 p.m. Again, we disagree. The video surveillance footage shows Nurse Workman checking on Mr. Beauford *after* Deputy Dalrymple's security round. Aplt. App. vol. 8 at 2383. Even if Deputy Perkinson failed to relay the report as the Estate contends, this was immaterial under the circumstances.

The district court correctly determined the Estate failed to establish a constitutional violation. Thus, we affirm the grant of summary judgment to Deputy Perkinson under the first prong of the qualified immunity analysis.[13]

### b.    Deputy Dalrymple

The district court also granted summary judgment to Deputy Dalrymple, concluding he, too, was entitled to qualified immunity on the Estate's deliberate indifference claim. We agree with the Estate that the district court erred. The Estate has carried its burden to meet the two-part qualified immunity test, *see Gutteridge*, 878 F.3d at 1238, and Deputy Dalrymple's motion for summary judgment based on qualified immunity should have been denied.

### i.    Constitutional Violation

As the district court acknowledged, there was a "ten-minute delay between when [Deputy Dalrymple] saw Mr. Beauford lying on the floor of his cell at 12:15 a.m. and when he alerted the nursing staff to this fact." Aplt. App. vol. 12 at 3304. The district court excused Deputy Dalrymple's delay in calling for medical help, however, reasoning "the mere fact that an officer observes a prisoner laying on the floor in the middle of the night is not, itself, enough to make it obvious to any lay person that immediate medical attention is required." *Id.* The district court concluded the Estate had failed to show a constitutional violation.

---

[13] Under these circumstances, we need not reach the Estate's allegation of error concerning the second prong of qualified immunity as applied to the claim against Deputy Perkinson. *See Pearson*, 555 U.S. at 236 (courts may address either prong of the qualified immunity test first).

The Estate contends the district court erred in its deliberate-indifference analysis by focusing only on the "mere fact" that Deputy Dalrymple observed Mr. Beauford motionless on the floor of his cell. As the Estate points out, Deputy Dalrymple waited ten minutes to summon medical assistance even though, at approximately 12:15 a.m., *he was unsure if Mr. Beauford was breathing*. The district court's failure to account for this fact and view it in the light most favorable to the nonmovant, the Estate argues, is reversible error. We agree.

During the 11:55 p.m. security check, Deputy Dalrymple looked into Mr. Beauford's cell and noticed the light was shut off. Deputy Dalrymple used his flashlight to illuminate Mr. Beauford and watched him for a few moments. He observed Mr. Beauford lying on the floor, facedown, with his head under his desk. In an interview statement given shortly after Mr. Beauford's death, Deputy Dalrymple said he was not concerned at the time about Mr. Beauford's sleeping position because "he ha[d] seen Mr. Beauford sleep in strange positions both on the floor and bed" so it was not "that unusual for him." Aplt. App. vol. 8 at 2282. He also stated he "believe[d] he saw Mr. Beauford's covers rising and falling indicating breathing." *Id.*

At about 12:15 a.m., Deputy Dalrymple conducted his next security round. He "only waited about 15 minutes"—instead of the usual 30 minutes—so he could "double check" on Mr. Beauford. *Id.* When interviewed on the night of Mr. Beauford's death, Deputy Dalrymple stated that, around 12:15 a.m., he looked inside Mr. Beauford's cell and "did not see any movement." *Id.* He "knocked on the door trying to get a response, but did not get any." *Id.* At this time, Deputy Dalrymple

23

"could not tell for sure if Mr. Beauford was breathing or not, so he returned to his officer station and got on the intercom trying to raise Mr. Beauford with negative results." *Id.* at 2282-83. Deputy Dalrymple said he "then got on the radio and asked for the nurse and another deputy to respond to help his check on Mr. Beauford." *Id.* Approximately ten minutes later, at 12:25 a.m.,[14] Deputy Dalrymple returned with Nurse Workman, and together they entered Mr. Beauford's cell.

Deputy Dalrymple's deposition testimony, however, suggests he may have thought Mr. Beauford *was* breathing at 12:15 a.m.:

> I decided to, at the time, you know, because of what happened earlier and with what Deputy Perkinson experienced with [Mr. Beauford] and previous briefings before, hearing that he had had medical events, I thought I would look into it a little bit more, which was why I did another security check starting at 12:15, you know, and walked around.
>
> And noticed that Mr. Beauford, as I came to his cell, he was in the same position. I used my flashlight, thought that, you know, he was—and it looked like his chest was rising and falling. He wasn't uncontrollably shaking.
>
> So I even knocked on the door a couple times. "Mr. Beauford?" "Mr. Beauford?" Got no response. It's not uncommon for inmates when they sleep, that they sleep hard and they don't hear you initially. So I continued on to finish the security check. Which prompted me to contact the nursing staff.
>
> Because I was not there to observe him when he had his medical event with Deputy Perkinson, I contacted the medical staff and said, Okay, what's normal? You know, is this normal, or is this not normal? So I deferred to Nurse [Workman].
>
> . . .

---

[14] The video summary shows Deputy Dalrymple and Nurse Workman entered Mr. Beauford's cell at 12:28 a.m. Aplt. App. vol. 8 at 2383.

> I go back with Nurse [Workman]. We go back to the cell. She looks in, and automatically—and looked at me and says, Start—muttered, Oh, shit, start CPR compressions.

Aplt. App. vol. 8 at 2310.

The focus of the subjective component of the deliberate indifference inquiry is the mental state of the defendant regarding the risk of harm. *See Prince*, 28 F.4th at 1044. Whether Deputy Dalrymple "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," *Sealock*, 218 F.3d at 1209 (quoting *Farmer*, 511 U.S. at 837), turns on his awareness, at approximately 12:15 a.m., that Mr. Beauford may not have been breathing, *see Mata*, 427 F.3d at 752 (whether a prison official knew of a substantial risk is a question of fact). According to his interview statement, Deputy Dalrymple was not sure whether Mr. Beauford was breathing at 12:15 a.m. Notwithstanding this uncertainty, Deputy Dalrymple waited ten minutes, completing his security check before seeking medical assistance for Mr. Beauford. But according to his deposition testimony, Deputy Dalrymple thought Mr. Beauford may have been breathing at 12:15 a.m. but was just nonresponsive. Any doubt about whether Mr. Beauford was in "obvious" medical distress is resolved by Nurse Workman's reaction when she arrived at Mr. Beauford's cell at around 12:25 a.m.: "She looks in [to Mr. Beauford's cell], and *automatically* . . . muttered, Oh, shit, start CPR compressions." Aplt. App. vol. 8 at 2310 (emphasis added).

The standard of review requires us "to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott*, 550 U.S. at 378 (alteration in original) (citation omitted). "In

qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts," *id.*, unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it," *id.* at 380. When the facts in the summary judgment record, and all reasonable inferences to be drawn from those facts, are viewed in the Estate's favor, a reasonable jury could believe Deputy Dalrymple acted with deliberate indifference by waiting ten minutes to call for medical help even though he knew Mr. Beauford might not be breathing.

A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (citation omitted). The substantial harm requirement "may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Garrett*, 254 F.3d at 950. Here, Mr. Beauford died. But our conclusion that substantial harm can result from a ten-minute delay in securing medical attention for an inmate who may not be breathing does not depend on the benefit of hindsight. *See Mata*, 427 F.3d at 752 (deliberate indifference does not require a corrections officer to "believ[e] that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm") (citation and emphasis omitted); *see also Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) ("Intentional delay in providing medical treatment shows deliberate disregard if a reasonable person would know that the inmate requires medical attention or the actions of the officers are so dangerous that a knowledge of the risk may be presumed.").

Whether Deputy Dalrymple was aware Mr. Beauford may not have been breathing at 12:15 a.m. raises a material factual dispute directly relevant to the qualified immunity analysis that precludes summary judgment. While we take no position on the merits, this genuine dispute of material fact undermines the district court's conclusion that the Estate has not satisfied its burden to show a constitutional violation at summary judgment. *See Olsen*, 312 F.3d at 1312 ("When the record shows an unresolved dispute of historical fact relevant to [the qualified] immunity analysis, a motion for summary judgment based on qualified immunity should be properly denied.") (internal citation omitted)).

Accordingly, on de novo review, we conclude the Estate has satisfied its burden on the first prong of qualified immunity, and the district court erred in concluding otherwise.

### ii. Clearly Established Law

We now turn to the second prong of the qualified immunity analysis. "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[F]or the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Halley v. Huckaby*, 902 F.3d 1136, 1149 (10th Cir. 2018) (citation omitted). Clearly established law should not be defined "at a high

27

level of generality," *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)), and should be "particularized to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotation marks omitted). "It is not enough that a rule be suggested by then existing precedent; the 'rule's contours must be so well defined it is clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'" *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).

"[T]here is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749; *see, e.g.*, *Sealock*, 218 F.3d at 1210-11 (concluding shift commander's inaction constituted deliberate indifference where inmate stated he might be having a heart attack and displayed symptoms consistent with a heart attack). But more specifically, "failing to provide . . . life-saving measures to an inmate in obvious need can provide the basis for liability under § 1983 for deliberate indifference." *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 678-79 (9th Cir. 2021) (citation omitted) (alteration in original). This includes delay—even brief delay—in summoning medical assistance, resulting in either unnecessary pain or a worsening of the prisoner's condition. *Mata*, 427 F.3d at 755; *see also Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) ("A delay in care for known unconsciousness brought on by asphyxiation is especially time-sensitive and must ordinarily be measured not in hours, but in a few minutes."), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *McRaven*, 577 F.3d at 983 (seven-minute delay); *Estate of Bradich v. City of*

*Chicago*, 413 F.3d 688, 691-92 (7th Cir. 2005) (holding a ten-minute delay in summoning assistance for inmate who had hanged himself could support finding of deliberate indifference); *Tlamka v. Serrell*, 244 F.3d 628, 633-34 (8th Cir. 2001) (holding a ten-minute delay in providing CPR or any other form of assistance to unconscious inmate could support finding of deliberate indifference).

The district court concluded the Estate failed to identify "a relevant case putting Deputy Dalrymple on notice that he needed to *immediately* call for help after seeing Mr. Beauford on the floor of his cell, which, as explained, was a common occurrence." Aplt. App. vol. 12 at 3307 (district court's emphasis). But, as we explained, the district court's framing was factually incomplete and thus misdirected the clearly-established-law inquiry. The relevant case here is not one that would have required Deputy Dalrymple to summon assistance immediately because Mr. Beauford was lying on the floor of his cell. Rather, the question is whether Deputy Dalrymple should have been on notice that the Constitution does not permit a ten-minute delay in seeking medical help for an inmate *who he knows may not be breathing*.

Here, the contours of the right are clearly established such that any reasonable officer in the situation Deputy Dalrymple confronted at 12:15 a.m. would know that delay could violate the Constitution. *See Estate of Booker v. Gomez*, 745 F.3d 405, 434 (10th Cir. 2014) (denying qualified immunity where officers delayed seeking medical care for three minutes after their use of force left inmate "limp and unconscious"); *Estate of Owensby v. Cincinnati*, 414 F.3d 596, 603 (6th Cir. 2005) (holding that arresting officers' six-minute delay in seeking medical care for arrestee

29

who died of asphyxiation could evince deliberate indifference); *McRaven*, 577 F.3d at 983 (denying qualified immunity where officer "made no attempt to resuscitate" the prisoner "for seven minutes before paramedics arrive[d]"); *Bozeman*, 422 F.3d at 1273 ("We also conclude that the Officers, who knew [the prisoner] was unconscious and not breathing and who then failed for fourteen minutes to check [his] condition, call for medical assistance, administer CPR or do anything else to help, disregarded the risk facing [him] in a way that exceeded gross negligence."); *Tlamka*, 244 F.3d at 633 ("Based on the obvious and serious nature of [the inmate's] condition, the corrections officers' alleged failure to even approach [the inmate] during the maximum 10-minute period would rise to a showing of deliberate indifference.").

For these reasons, we also conclude the Estate has satisfied its burden on the second prong of the qualified immunity test—to show Deputy Dalrymple violated a clearly established constitutional right.

### iii.  Summary Judgment Ruling

Because Deputy Dalrymple asserted a qualified immunity defense at summary judgment, the burden shifted to the Estate to demonstrate on the facts alleged that (1) Deputy Dalrymple acted with deliberate indifference to Mr. Beauford's serious medical needs in violation of the Fourteenth Amendment, and (2) that the right was clearly established at the time of the alleged misconduct. *See Riggins*, 572 F.3d at 1107. As we have explained, the Estate has carried its burden to meet this two-part test. *See Gutteridge*, 878 F.3d at 1238. Even when qualified immunity is at issue, the

30

defendant still must show that no material facts remain in dispute that would defeat the qualified immunity defense. Whether Deputy Dalrymple was aware that Mr. Beauford was not breathing is a material fact in genuine dispute. We cannot imagine a more material fact in the context of the Estate's deliberate indifference claim than whether Deputy Dalrymple knew of the risk that Mr. Beauford was not breathing. The district court failed to account for this dispute, which a reasonable jury could resolve in favor of the Estate. Under these circumstances, we must reverse the district court's grant of summary judgment to Deputy Dalrymple.

**2.    The district court did not err by granting summary judgment to the Individual Medical Defendants.**

**a.    The Estate's Claims Against Dr. Holmes and Mr. LeFebre**

We turn now to the Estate's contentions of error surrounding the district court's grant of summary judgment in favor of the medical staff at MCDF,[15] beginning with Dr. Holmes and Mr. LeFebre—the two defendants who oversaw the care Mr. Beauford received during his detention. The district court ruled the evidence

---

[15] The Estate has taken a kitchen-sink approach to its appellate contentions concerning the grant of summary judgment to the medical staff at MCDF. For example, the Estate maintains the nurse defendants practiced beyond the scope of their abilities and failed to provide appropriate care for Mr. Beauford's seizures or change his course of treatment. These arguments are presented in a conclusory manner without factual and legal development, so we decline to address them. *See Stuart v. Erickson Living Mgmt.*, 822 F. App'x 682, 684 (10th Cir. 2020) ("We 'will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'") (quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004)); *United States v. Davis*, 622 F. App'x 758, 759 (10th Cir. 2015) ("[I]t is not this court's duty, after all, to make arguments for a litigant that he has not made for himself.").

31

was insufficient to establish Dr. Holmes or Mr. LeFebre acted with deliberate indifference to Mr. Beauford's serious medical needs. The Estate challenges this ruling on appeal, contending Dr. Holmes and Mr. LeFebre were deliberately indifferent by depriving Mr. Beauford of access to his VNS bracelet and failing to forcibly medicate him, transfer him to another facility, and ensure he received appropriate psychiatric care. Viewing the facts in the light most favorable to the Estate, we discern no error in the district court's ruling.

"[A]bsent an extraordinary degree of neglect," the subjective component of the deliberate-indifference test is not satisfied "where a doctor merely exercises his considered medical judgment." *Self*, 439 F.3d at 1232. "So long as a medical professional provides a level of care consistent with the symptoms presented by the inmate, absent evidence of actual knowledge or recklessness, the requisite state of mind cannot be met." *Id.* at 1233.

Applying de novo review, we disagree with the Estate that Dr. Holmes and Mr. LeFebre acted with deliberate indifference.[16] Rather, the evidence supports the conclusion they exercised medical judgment. For example, the Estate insists

---

[16] We take no position on whether any of the Individual Medical Defendants were medically negligent in providing (or failing to provide) care to Mr. Beauford. *See, e.g.*, *Estelle*, 429 U.S. at 105-06 (The "inadvertent failure to provide adequate medical care" or "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."); *Self*, 439 F.3d at 1233 ("[N]egligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation.") (quoting *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999)).

Dr. Holmes and Mr. LeFebre should have pursued a forcible medication order because Mr. Beauford only took his anti-seizure medication half the time. But as the district court properly found, the evidence shows Mr. Beauford "had responded for the most part to less-intrusive methods of encouragement." Aplt. App. vol. 12 at 3314. *But see Estate of Wright v. Lake City*, No. 2:13-CV-333 JVB, 2017 WL 3896270, at *5 (N.D. Ind. Sept. 6, 2017) (concluding doctors should have considered "more aggressive measures" where inmate was "repeatedly refus[ing] medication and treatment against his own interest," but "the medical staff did little more than chart [the inmate's] downward spiral"). And despite his refusals, Mr. Beauford continued to receive medical care.

Likewise, as Defendant CHC correctly observes on appeal, Dr. Holmes and Mr. LeFebre considered—but ultimately decided against—transferring Mr. Beauford to another facility or referring him to a psychiatrist. Both defendants explained that inmates were considered for transfers or referrals when they exhibited certain behaviors that posed a risk to themselves or others. But in their view, Mr. Beauford never exhibited such behaviors. Aplt. App. vol. 6 at 1614, 1737. Given this explanation, a reasonable jury could not infer conscious disregard for Mr. Beauford's serious medical needs. *Self*, 439 F.3d at 1232-34.

And regarding access to the VNS bracelet, our de novo review of the record confirms the district court's conclusion: Mr. LeFebre was the only medical defendant who definitively knew Mr. Beauford had a VNS bracelet when he came to the jail. And it is undisputed he believed Mr. Beauford was allowed to have access to the

bracelet but chose not to wear it. Aplt. App. vol. 6 at 1736. The Estate has shown no evidence to suggest Dr. Holmes was also aware the bracelet existed, let alone that he or Mr. LeFebre took particular steps to deprive Mr. Beauford of it.

Although the Estate disagrees with Dr. Holmes and Mr. LeFebre, a "mere difference of opinion over matters of expert medical judgment or a course of medical treatment fails to rise to the level of a constitutional violation." *Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019)). Nor will we "freely substitute [our] judgment" for that of Dr. Holmes or Mr. LeFebre or "otherwise second-guess [their] course of treatment with the benefit of hindsight." *Id.* (alteration in original) (quoting *Redmond v. Crowther*, 882 F.3d 927, 938 (10th Cir. 2018)).

The Estate makes two other appellate arguments, singling out Dr. Holmes and Mr. LeFebre for particular decisions they made (or failed to make) about Mr. Beauford's care. Neither is availing.

Regarding Dr. Holmes, the Estate contends he was deliberately indifferent by failing to draw and test Mr. Beauford's blood to monitor for therapeutic levels of anti-seizure medication in his bloodstream. There is no dispute Mr. Beauford's blood was never drawn—that clearly violates CHC policy. But a policy violation, without more, is not a constitutional violation. *See Mata*, 427 F.3d at 760. And the Estate has identified no evidence suggesting Dr. Holmes disregarded Mr. Beauford's serious medical needs by failing to conduct these blood tests. This absence of evidence undermines an essential component of the Estate's deliberate indifference claim:

34

Dr. Holmes's subjective intent. Given these evidentiary shortcomings, and because the decision to conduct specific testing generally falls within the bounds of medical judgment, *see Self*, 439 F.3d at 1232, we discern no error in the grant of summary judgment to Dr. Holmes.

Finally, the Estate asserts Mr. LeFebre violated Mr. Beauford's constitutional rights by housing him in "solitary confinement."[17] Aplt. Opening Br. at 65-66. The district court rejected this argument, concluding there was insufficient evidence Mr. Beauford was housed in a single cell "out of indifference to the effects on him, rather than because [MCDF] believed the benefits outweighed the costs." Aplt. App. vol. 12 at 3325. We agree with the district court.

On appeal, the Estate advances conclusory assertions but points to no evidence from which a jury could reasonably infer *Mr. LeFebre* knew that a single-cell housing placement presented a substantial risk to Mr. Beauford's health and safety.[18] For instance, Mr. LeFebre explained MCDF considered Mr. Beauford "a vulnerable

---

[17] To the extent the Estate asks us to hold that placing inmates with Mr. Beauford's health conditions in solitary confinement or single cells is per se deliberate indifference, we decline to do so in this case. *But see Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1306 (10th Cir. 2021) (discussing district court cases from before 2014 holding "that isolating mentally ill inmates in conditions that seriously and predictably exacerbate their mental illness is cruel and unusual when the official has subjective knowledge of both the mental illness and the impact of isolation").

[18] Citing its experts, the Estate maintains that, as a general matter, housing an individual with medical and mental health conditions in solitary confinement is inappropriate. Aplt. Opening Br. at 17 (citing Aplt. App. vol. 7 at 1921-22, 1958). A reasonable jury could not infer from such generalized assertions that Mr. LeFebre acted with deliberate indifference in this case.

inmate that would be taken advantage of by other inmates." Aplt. App. vol. 6 at 1712. Placing Mr. Beauford in a single cell separated him from other inmates and ensured he was "housed in a safe environment." *Id.*

Our de novo review confirms Mr. LeFebre's decision about Mr. Beauford's housing placement was an exercise of professional medical judgment and thus does not satisfy the subjective component of the deliberate indifference test. *See Self*, 439 F.3d at 1232.

Accordingly, we affirm the grant of summary judgment to Dr. Holmes and Mr. LeFebre.

### b.    The Estate's Claims Against the Nurses

The Estate also challenges the district court's ruling that defendant Nurses Workman, Havens, Keenan, and Schans were not deliberately indifferent to Mr. Beauford's serious medical needs. According to the Estate, the evidence shows the nurses—together—evinced deliberate indifference to Mr. Beauford's serious medical needs when they (1) failed to elevate concerns about Mr. Beauford's seizures and medication refusals to Dr. Holmes, (2) practiced beyond the scope of their abilities, (3) failed to monitor Mr. Beauford's medications through blood draws, (4) deprived Mr. Beauford of his VNS bracelet, and (5) failed to intervene to prevent Mr. Beauford from refusing his medications.

We reject this challenge. It is the Estate's burden under § 1983 to establish what each defendant actually did and how that act (or omission) violated Mr. Beauford's constitutional rights. *See Pahls v. Thomas*, 718 F.3d 1210, 1225-26

36

(10th Cir. 2013). As the nurses correctly argue, the Estate fails at a fundamental level to explain who is alleged to have done what; instead, the Estate simply groups the nurses together without, as required, "identify[ing] *specific* actions taken by *particular* defendants." *Id.* at 1226 (citation omitted).

For example, the Estate contends the nurses generally knew Mr. Beauford "had an implanted VNS device with a bracelet that was required for its activation" but they deprived him of access to it. Aplt. Opening Br at 54. For support, the Estate cites deposition testimony from Nurses Schans and Keenan. But that testimony reflects only these two defendants knew Mr. Beauford had an implanted VNS device, not a bracelet to activate it. And it says nothing about what Nurses Workman and Havens knew nor does it suggest either nurse actually deprived Mr. Beauford of his bracelet. The Estate also asserts the nurses "knew about [Mr.] Beauford's medication refusals" but "did nothing more than continu[e] to ineffectually offer [Mr.] Beauford his medications." Aplt. Opening Br. at 57-58. This contention is general and vague, and it fails to account for the varying levels of involvement each nurse had in Mr. Beauford's care. We discern no error in the district court's grant of summary judgment to the nurses.

The Estate also challenges the district court's ruling regarding the subjective prong as it applies to Nurse Workman's conduct on the night Mr. Beauford died in custody. The Estate contends Nurse Workman acted with deliberate indifference by repeatedly failing to provide or to refer Mr. Beauford for adequate medical care—emergency or otherwise. The Estate highlights three occasions on the evening of Mr.

37

Beauford's death when Nurse Workman allegedly should have, but failed, to do more: (1) after Mr. Beauford suffered a five-minute seizure at 8:40 p.m.; (2) when Deputy Dalrymple observed Mr. Beauford shaking in his cell around 9:00 p.m. and Nurse Workman opined he would be fine without checking on him; and (3) at 12:25 a.m. when she waited for another deputy to respond before entering Mr. Beauford's cell to discover he was dead.

Viewing the record in the light most favorable to the Estate, we agree Nurse Workman should have notified Dr. Holmes about Mr. Beauford's seizure at 8:40 p.m. An internal report documenting the incident states, "If [a] patient with a known seizure disorder has a seizure and it resolves without consequence call the provider" with a checkmark next to that statement, suggesting it was done. Aplt. App. vol. 7 at 1889. Yet the evidence is clear that Nurse Workman never notified Dr. Holmes. Rather, as we described, Nurse Workman and Deputy Perkinson entered Mr. Beauford's cell and cared for him until his seizure ended. Nurse Workman "made sure he was safe [and] breathing. When the seizure stopped, [she] made sure he wasn't injured." *Id.* at 1831. She asked Mr. Beauford if he needed anything and tried to take his vitals, but he refused. She returned with Deputy Perkinson to check on Mr. Beauford thirty minutes later, but he "still refused to let [her] check his vital signs." Aplt. App. vol. 6 at 1548; vol. 8 at 2284. She noted no "injuries" or "distress," and believed "officers will notify medical if they note any problems." Aplt. App. vol. 6 at 1548.

38

Although medical judgment and misdiagnosis can cross the line into a denial of care amounting to deliberate indifference, we conclude, under the circumstances here, that Nurse Workman's treatment of Mr. Beauford did not go so far. *Cf. Mata*, 427 F.3d at 758 (holding where medical provider had knowledge inmate was suffering chest pain, it would be more than malpractice or negligence not to call an ambulance). Here, the Estate fails to show how Nurse Workman disregarded Mr. Beauford's wellbeing, where the record shows she was with him during his seizure, remained with him immediately afterward, and returned thirty minutes later to check on him. And according to her observations of Mr. Beauford's condition, she believed his seizure had resolved and he was no longer in medical distress. *See Self*, 439 F.3d at 1233 ("[O]ur subjective inquiry is limited to consideration of the doctor's knowledge at the time [they] prescribed treatment for the symptoms presented, not to the ultimate treatment necessary.").

Yet the Estate insists "there is ample evidence from which a jury could conclude that promptly calling paramedics was the *only* medically acceptable option for [Nurse] Workman, yet she consciously chose not to" do so. Aplt. Opening Br. at 48-49 (internal quotation marks omitted). We are not persuaded. A conclusory assertion that ample evidence exists does not make it so. The Estate offers no record citations to support its argument nor have we discerned that any such evidence exists in our independent review. At most, the Estate's argument reflects a difference of opinion over whether Mr. Beauford should have been sent to a hospital—a scenario that cannot support deliberate indifference. *See Petties v. Carter*, 836 F.3d 722, 729

39

(7th Cir. 2016) ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.").

The Estate's other two arguments concerning Nurse Workman also fail. First, the evidence shows Nurse Workman checked on Mr. Beauford after Deputy Dalrymple reported seeing him shaking in his cell. Given Nurse Workman's more recent visit to Mr. Beauford's cell, we conclude she was not deliberately indifferent when opining his condition was "fine." Aplt. App. vol. 8 at 2282. The Estate next contends that "[r]ather than responding emergently, [Nurse] Workman waited for another deputy to arrive before going into [Mr. Beauford's] cell" at 12:25 a.m. Aplt. Opening Br. at 48. But a written summary of the video surveillance footage states otherwise: "At 0028 hrs. on 041614 Deputy Dalrymple and Nurse Workman return to [Mr. Beauford's cell] and enter the cell, Deputy Dalrymple stays in the cell as Nurse Workman leaves for about a minute, then Nurse Workman returns carrying an item and many other deputies arrive to the scene at about 0030 hrs. on 041614." Aplt. App. vol. 8 at 2283. The Estate's arguments are contradicted by the record.

We affirm the grant of summary judgment for the defendant nurses.

## D.  The Estate's Municipal Liability Claim under § 1983

A municipality cannot be liable under *Monell v. Department of Social Services of New York*, 436 U.S. 658, 691 (1978), "*solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under a *respondeat superior* theory." Rather, to be held liable the municipality itself must have generated the "moving force" behind the alleged constitutional violation, either through official

40

policy or widespread and pervasive custom. *See City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).

At its core, the Estate's *Monell* claim against Mesa County and the Entity Medical Defendants is the alleged customs and practices at MCDF of providing an unconstitutional level of care to detainees. The district court granted summary judgment to the entity defendants because none of their agents committed an underlying constitutional violation.

Because we reverse the district court's ruling as to Deputy Dalrymple, we must reverse and remand the grant of summary judgment on the Estate's *Monell* claim to allow the district court an opportunity to assess whether there is a viable claim for municipal liability against Mesa County. *See Lowe v. Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).

As for CHC, we agree with the district court that summary judgment was proper. This Court has extended *Monell* liability to private entities.[19] *See Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003). Because none of the Individual Medical Defendants committed a constitutional violation, the Entity

---

[19] The Estate asks us to revisit *Dubbs* because federal district courts in this circuit and elsewhere have called into question *Monell*'s application to private entities sued under § 1983. We decline the invitation in this case. *See Strain*, 977 F.3d at 993 (explaining that generally one panel may not overrule the decision of a prior panel absent en banc consideration or an intervening Supreme Court decision).

Medical Defendants cannot be liable under *Monell*.[20] *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006). The Estate's argument to the contrary is unavailing.

### E.   Remaining Contentions

#### 1.    The Estate's ADA Claim

The district court granted summary judgment to Mesa County on the Estate's ADA claims. We reject the Estate's challenge to that ruling.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "This provision extends to discrimination against inmates detained in a county jail." *Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1193 (10th Cir. 2007).

---

[20] On appeal, the Estate contends the district court's holding regarding *Monell* liability "was incorrect and in direct contravention of . . . well-established precedent." Aplt. Opening Br. at 68. The Estate maintains that, even absent a constitutional violation by an individual employee, the district court should still have considered whether CHC was liable under *Garcia* and its progeny. *See Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 310 (10th Cir. 1985) ("Although the acts or omissions of no one employee may violate an individual's constitutional rights, the combined acts or omissions of several employees acting under a governmental policy or custom may violate an individual's constitutional rights."); *see also Crowson v. Washington Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020) ("[T]he municipality may not escape liability by acting through twenty hands rather than two."). But the Estate did not present this theory of liability to the district court. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) (applying waiver where legal arguments were raised for the first time on appeal and plaintiff further failed to argue for plain-error review). And regardless, the Estate's custom-or-practice claims fail on the merits because it does not point to any evidence from which a jury could reasonably infer CHC acted with deliberate indifference by enacting the alleged customs or policies. *See Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).

To state a claim under Title II, the Estate must show: (1) Mr. Beauford is a "qualified individual with a disability"; (2) he was "excluded from participation in or denied the benefits of [MCDF's] services, programs, or activities"; and (3) "such exclusion, denial of benefits, or discrimination was by reason of his disability." *Id.*

In granting summary judgment to Mesa County on the Estate's ADA claim, the district court found the Estate "produced no evidence of any specific service [Mr. Beauford] wanted access to and was denied" and, consequently, the Estate was "ask[ing] the court to assume that [Mr. Beauford] was necessarily denied access to the Detention Facility's services or programs because he was segregated" in single cell housing in Cedar Pod. Aplt. App. vol. 12 at 3327-28. The district court characterized the Estate's arguments as "conclusory and insufficient" and rejected them. *Id.* at 3327. We do the same.

On appeal, the Estate merely reprises the arguments it made in the district court, without persuasively explaining why the district court erred. The gist of the Estate's argument is Mr. Beauford's mere placement in administrative segregation was a de facto denial of access to *all* MCDF's programs, services, and benefits available to detainees *not* in administrative segregation. But to show a violation under Title II, the Estate must identify evidence in the record of a specific service, program, or activity requested by, but denied to, Mr. Beauford. *See Hockaday v. Colo. Dep't of Corr.*, 766 F. App'x 572, 575 (10th Cir. 2005). The Estate has not

43

made this showing or explained why it is relieved of the burden imposed on it by applicable law to do so.[21]

Thus, the district court did not err in granting summary judgment to the County on the Estate's ADA claims.

### 2. Mesa County's Personal Jurisdiction Arguments

The Mesa County Defendants raised a lack of personal jurisdiction defense in district court. The district court did not address the merits of this argument, however, concluding any challenge to personal jurisdiction was moot because all claims against the County had been dismissed on summary judgment.

On appeal, the County again advances the lack of personal jurisdiction defense. The district court never obtained jurisdiction over Mesa County or the Mesa County Sheriff, the argument proceeds, because the Estate "failed to properly sue the board of county commissioners of Mesa County and sued the wrong sheriff." Cnty. Answer Br. at 38.[22] Because we reverse in part the grant of summary judgment to the Mesa County Defendants, the personal jurisdiction question is no longer moot, as the

---

[21] In light of this conclusion, we need not reach the Estate's remaining contention that any such exclusion, denial of benefits, or discrimination was by reason of Mr. Beauford's disability.

[22] To the extent the County's arguments regarding Sheriff Lewis involve insufficient service of process rather than personal jurisdiction, they fail for similar reasons. Service, like personal jurisdiction, is a waivable defense if not timely asserted. *See* Fed. R. Civ. P. 12(h)(1).

district court assumed.[23] We now consider the Mesa County Defendants' lack of personal jurisdiction defense and reject it.

"Until the court has established personal jurisdiction [over a party], any assertion of judicial power over the party violates due process." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982). However, unlike subject-matter jurisdiction, the defenses of lack of personal jurisdiction and service are waived if not timely asserted. *See* Fed. R. Civ. P. 12(h)(1); *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174-75 (10th Cir. 1992). It is well settled that "jurisdiction over a party may be conferred upon a court . . . by voluntary appearance of a party." *Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986) (per curiam); *see also Hunger U.S. Special Hydraulics Cylinders Corp. v. Hardie-Tynes Mfg. Co.*, No. 99-4042, 2000 WL 147392, at *3 (10th Cir. Feb. 4, 2000) ("After its lengthy participation in this litigation, efforts to seek affirmative relief, and settlement of claims, [Defendant] may not pull its personal jurisdiction defense out of the hat like a rabbit.") (citation omitted)). Federal Rule of Civil Procedure 12 "not only contemplates the lodging of certain defenses at the earliest point in a lawsuit, it mandates a waiver of those defenses if not presented at the first

---

[23] In the interest of judicial efficiency, we exercise our discretion to consider the merits of the personal jurisdiction issue instead of remanding the issue to the district court. The standard of review for questions of personal jurisdiction is de novo, *see ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1214 (10th Cir. 2011); there are no appellate preservation problems; the parties have had an opportunity to brief the issue; and the facts are undisputed.

45

available opportunity." *Travelers Cas. & Sur. Co. v. Unistar Fin. Serv. Corp.*,

35 F. App'x 787, 787 (10th Cir. 2002).

By the time the County raised personal jurisdiction as a defense, it had been

actively defending against the Estate's lawsuit for years. Under the circumstances,

we conclude the County and the Mesa County Sheriff waived any personal

jurisdiction or service defenses.[24]

### III.    Conclusion

We affirm the grant of summary judgment to Deputy Perkinson and the

Individual and Entity Medical Defendants on the Estate's § 1983 claims. We also

affirm the grant of summary judgment to Mesa County on the Estate's ADA claim.

We reverse the district court's grant of summary judgment to Deputy

Dalrymple and to the Mesa County Defendants on the Estate's municipal liability

claim. The case is remanded for further proceedings consistent with this opinion.

---

[24] The Mesa County Defendants also argue the Estate's attempt to substitute the new Sheriff under Federal Rule of Civil Procedure 25(d) was improper. We need not decide this issue because the Estate sued the Mesa County Sheriff in his official capacity.